Maria **DRACOS**, as Administratrix of the Estate of Nicholas Dracos, Deceased, Plaintiff-Appellant,

v.

**HELLENIC LINES LIMITED,** a Corporation, Defendant-Appellee.

No. 81–1870.

United States Court of Appeals, Fourth Circuit.

Argued March 4, 1982.

Decided April 27, 1983.

Avram G. Adler, Philadelphia, Pa. (Anne
E. Fialkowski, Adler, Barish, Levin & Cres-
koff, Philadelphia, Pa., C. Arthur Rutter,
Jr., John H. Klein, Breit, Rutter & Montag-
na, Norfolk, Va., on brief), for plaintiff-ap-
pellant.

Carter B.S. Furr, W.L. Berkley, III, Norfolk, Va. (Jett, Agelasto, Berkley, Furr & Price, Norfolk, Va., on brief), for defendant-appellee.

Before WIDENER and MURNAGHAN, Circuit Judges, and POTTER, District Judge.*

WIDENER, Circuit Judge:

This appeal presents to us the principal issue of what, if any, collateral estoppel effect facts previously found which underlie the choice of law in a maritime tort action should have in resolving a similar choice of law issue in a later action. Also involved is whether there are sufficient American contacts to require a choice of the law of the United States. The district court refused to give collateral estoppel effect to prior cases and concluded that the law of the United States did not apply. On the basis of this choice of law, the district court further concluded that it lacked subject-matter jurisdiction and granted the defendant's motion for judgment notwithstanding the verdict. We affirm.

I.

Nicholas Dracos was the chief engineer aboard the M/V HELLENIC STAR. He was last seen alive on May 14, 1977, when the ship was berthed in Norfolk, Virginia. Later that day, members of the crew found Dracos dead in the ship's refrigerator hold.

Maria Dracos, the widow of Nicholas Dracos and the administratrix of his estate, filed suit on account of the death of her husband against Hellenic Lines, Ltd., which was his employer and the ship's owner. The complaint asserted causes of action for damages on account of negligence under the Jones Act, 46 U.S.C. § 688, and for unseaworthiness under the general "American Maritime Law," apparently as a pendent claim. See *Romero, infra,* 358 U.S. at p. 380, 79 S.Ct. at p. 484.

Throughout the course of this action, the defendant contested the district court's jurisdiction on the ground that the law of the United States did not apply. The defendant raised the issue of the applicability of foreign law in its answer and reiterated its position in its pre-trial statement of issues and in various motions. Because it believed that Greek law determined the rights and liabilities of the parties, the defendant also asserted that the plaintiff's causes of action did not arise under the laws of the United States and thus the plaintiff had failed to state a jurisdictional basis for her suit. After the jury returned a plaintiff's verdict, the defendant moved for judgment n.o.v. Upon considering this motion, the district court concluded that neither federal law nor general maritime law of the United States applied in this case. The district court thus found itself to be without jurisdiction and entered judgment for the defendant.[1]

---

* United States District Court for the Western District of North Carolina, sitting by designation.

1. We have not had urged upon us and do not decide any effect *The Bremen* and *Mercury Coal* cases, infra, should have upon our decision, but note that if the rules followed in those cases apply here the result would be the same. We also note that in *Lauritzen,* infra, 345 U.S. at 589, 73 S.Ct. at 931, the Court recognized that a contractual choice of law should generally control the parties' rights and duties, unless public policy requires otherwise. While *Rhoditis,* infra, did not in terms address the contractual choice of forum question, it could have been raised in that case. Whether there is any inconsistency between *Rhoditis* and *The Bremen,* the Court has not decided.

In *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 17, 92 S.Ct. 1907, 1917, 32 L.Ed.2d 513 (1972), decided after *Rhoditis,* infra, the Court upheld a forum selection clause in an international contract in an admiralty case, even though it would result in the application of foreign law in a foreign court. It held that forum-selection clauses are prima facie valid and should be enforced unless they are unreasonable under the circumstances. Id. at 10, 92 S.Ct. at 1913. *The Bremen* involved causes of action in contract and in tort, but the Court placed a heavy burden of proof on the party claiming that the particular controversy was not one in mind when the parties contracted. Id. at 17, 92 S.Ct. at 1917. *The Bremen* has been followed, in this Circuit and elsewhere, in cases not involving international contracts or suits in Admiralty. See *Mercury Coal & Coke, Inc. v. Mannesmann Pipe and Steel Corp.,* 696 F.2d 315 at 317 (4th Cir.1982).

## II.

Federal courts are courts of limited jurisdiction; their jurisdiction will not be presumed. *Lehigh Mining & Manufacturing Co. v. Kelly,* 160 U.S. 327, 337, 16 S.Ct. 307, 311, 40 L.Ed. 444 (1895). Accordingly, plaintiffs must affirmatively plead the jurisdiction of the federal court. FRCP 8(a)(1); *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936). Of course, a federal court has jurisdiction to inquire into its own jurisdiction, *Romero v. International Terminal Co.,* 358 U.S. 354, 359, 79 S.Ct. 468, 473, 3 L.Ed.2d 769 (1959), and the district court did just that in the case at hand.

The plaintiff concedes, as she must, that she had the burden of showing such facts that would lead the court to choose American law. Therefore, the plaintiff's burden of proving jurisdiction was principally a burden to show that the court must choose American law, for on its choice of law its jurisdiction depended.

In *Lauritzen v. Larsen,* 345 U.S. 571, 583–90, 73 S.Ct. 921, 928–32, 97 L.Ed. 1254 (1953), the Supreme Court enumerated seven factors to be considered in choosing the proper choice of law to govern a maritime tort: (1) the place of the wrongful act, (2) the law of the flag, (3) the allegiance or domicile of the injured seaman, (4) the allegiance of the defendant shipowner, (5) the place of the execution of the employment contract, (6) the inaccessibility of the foreign forum, and (7) the. law of the forum. The Court explained that like factors guide choices of law in light of the interests of the governments and national interest involved. Id. at 582, 73 S.Ct. at 928. They also determine the applicability of both the Jones Act and general maritime law. *Romero,* supra, 358 U.S. at 382, 79 S.Ct. at 485. The Supreme Court has also said that these seven factors are not exhaustive and that they should not be applied mechanically. *Hellenic Lines, Ltd. v. Rhoditis,* 398 U.S. 306, 308–09, 90 S.Ct. 1731, 1733–34, 26 L.Ed.2d 252 (1970). The *Rhoditis* Court added other factors to be considered in choosing the proper law. The presence of the foreign shipowner's base of operations within the United States was an important factor in making the Jones Act apply to a foreign seaman's tort claim. 398 U.S. at 309, 90 S.Ct. at 1734. Additionally, it was held that the substantial and continuing American contacts of Hellenic Lines had to be considered. 398 U.S. at 310, 90 S.Ct. at 1734.

The district court in the case before us carefully considered these factors. The defendant shipowner and employer was a Greek corporation. Its vessels flew the Greek flag and were registered under Greek law. Both the plaintiff and her husband were Greek citizens and domiciliaries. The contract of employment between Nicholas Dracos and the defendant was drafted and executed in Greece as a collective bargaining agreement of the Panhellenic Seaman's Federation. The contract made Greek law in Greek courts control the rights and liabilities arising from the employment relationship. Maria Dracos had remedies available in a Greek court had she chosen to seek them.

The district court found that only two of the *Lauritzen* factors pointed to the selection of American law. Nicholas Dracos died while the M/V HELLENIC STAR was berthed in Norfolk, and his widow sued in the United States District Court for the Eastern District of Virginia. As the district court correctly noted, these two factors are relatively unimportant in a maritime context. Because a ship may travel through waters governed by various nations, the test of lex loci delicti would introduce an untoward uncertainty in which standards apply. *Romero,* supra, 358 U.S. at 384, 79 S.Ct. at 486; *Lauritzen,* supra, 345 U.S. at 583, 73 S.Ct. at 928. The nature of maritime commerce is such that a vessel will inevitably have contacts with many different nations. If the courts of each nation with substantial contacts applied their own law, the overlapping duties imposed on shipowners would blight maritime shipping. *Lauritzen* at 581, 73 S.Ct. at 927. And as is often the case with maritime torts, the place of the wrong in this case was fortuitous. *Romero* 358 U.S. at 384, 79 S.Ct. at 486.

The filing of suit in federal court is also immaterial unless this country has a significant interest in having its law applied. See *Lauritzen,* supra, 345 U.S. at 590–91, 73 S.Ct. at 932–33. An American interest can be most readily made out when the two most important *Lauritzen* factors, the ship's flag and the shipowner's allegiance, point to this country. *Lauritzen,* supra, at 584–87, 73 S.Ct. at 929–31. In *Rhoditis,* however, the Supreme Court decided that an analysis should take into account substantial and continuing American contacts. *Rhoditis* held that when the shipowner, although a foreign corporation, had its base of operations in the United States, and had substantial and continuing contacts with this country, then American law applied in a maritime tort action. *Rhoditis,* supra, 398 U.S. at 310, 90 S.Ct. at 1734.

In concluding that American law did not apply in this action against the same party defendant sued in *Rhoditis,* the district court examined the evidence of the defendant's operations and contacts with the United States. The court found the evidence insufficient to show an American base of operations or substantial enough American contacts to require an application of either the Jones Act or general American maritime law. These findings are factual and are not clearly erroneous. FRCP 52(a). It also concluded that earlier cases in which federal courts determined that American law applied in cases involving Hellenic Lines had no collateral estoppel effect.

### III.

In the district court, the plaintiff relied on a number of cases, in which Hellenic Lines had been involved in the federal courts, to support its theory of offensive collateral estoppel. On appeal it does not rely on any of them except *Rhoditis,* which we will discuss later, and *Vassalos v. Hellenic Lines,* 482 F.Supp. 906 (E.D.Pa.1979). *Vassalos* does not serve as an estoppel because there was no choice of law question decided in that case. Plaintiff's claim that Hellenic stipulated in *Vassalos* to the appli-

cability of the Jones Act is an incorrect construction of that opinion, which states that the stipulation in question was that the action was "prosecuted pursuant" to the Jones Act, not a stipulation of choice of law to confer jurisdiction.

In *Rhoditis,* the Supreme Court held that the defendant was subject to American law based on a finding that the shipowner had its base of operations in the United States and had substantial and continuing American contacts. Those findings, however, concern the defendant's operations only at the time of the *Rhoditis* case. The *Rhoditis* Court did not purport to find that the defendant had its operations permanently based in this country or that its American contacts would continue indefinitely. Twelve years elapsed between the injury to Rhoditis and the death of Dracos.

The plaintiff in this action, who was neither a party nor in privity with a party to the *Rhoditis* litigation, asserts that she does not bear the burden of proving that the defendant had an American base of operations or substantial continuing American contacts because of the effect of the findings in *Rhoditis.* This is her principal claim on appeal.

The plaintiff's assertion is made possible by the discard of the doctrine of mutuality. That doctrine prevented a party from using a prior judgment to estop an adverse party from contesting an issue unless both parties were bound by the judgment. *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 328, 91 S.Ct. 1434, 1442, 28 L.Ed.2d 788 (1971). *Blonder-Tongue* approved in patent cases a defensive use of collateral estoppel, which in that case was a defendant's attempt to estop the relitigation of an issue that the plaintiff had already unsuccessfully litigated in a suit against another defendant. *Blonder-Tongue,* however, was a prelude to the offensive use of collateral estoppel by which a plaintiff may seek to estop a defendant from relitigating an issue previously litigated and lost to another and different plaintiff.

In *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), the Supreme Court sanctioned the use of offensive collateral estoppel. *Parklane* approved a plaintiff's estoppel of a defendant from litigating an issue the defendant had previously lost in a suit against another and different plaintiff. In doing so, however, the Court granted district courts "broad discretion to determine when it should be applied." *Parklane* at 331, 99 S.Ct. at 651.

In the instant case, the plaintiff's attempt to preclude the defendant from relitigating the issue of the location of its base of operations or the substantiality of its American contacts is its claim to the use of offensive collateral estoppel.[2] The district court considered the propriety of allowing the defendant to be so estopped, and concluded that the doctrine should not apply. In refusing to apply the doctrine, the court reasoned at one place that earlier adjudication reflected the status of the defendant only as it existed several years prior to the accrual of the cause of action (twelve years between *Rhoditis* and the instant case, and ten years in the only other case on point). We think that the district court's holding that the doctrine did not apply to the defendant is not an abuse of its broad discretion in view of the lapse of time.

The dynamic nature of the shipping industry, with its constantly ·changing economic climate and regularly changing fleets, ports, and operations, indicates a changing factual situation that may require the choice of American law under *Lauritzen* and *Rhoditis* one year but may not require the same choice some years later. The district court pointed out in its opinion relevant facts with respect to base of operations and American contacts proved to have existed at the time of *Rhoditis* which the plaintiff did not prove continued to exist at the time of the injury or trial in this case.

That is an additional reason for us to find that the district court did not abuse its discretion in declining to apply collateral estoppel to the facts necessary to make a choice of law upon which its jurisdiction depended. The case of *International Shoe Machine Corp. v. United Shoe Machinery Corp.,* 315 F.2d 449 (1st Cir.1963), is persuasive here. In that case, offensive collateral estoppel was claimed under § 5 of the Clayton Act, 15 U.S.C. § 16, which established a kind of statutory offensive collateral estoppel well prior to the *Parklane* decision. The statute permits a final judgment or decree in favor of the United States to be used as prima facie evidence by any other party as to all matters to which the defendant would be estopped in another action by the government. The court held that offensive collateral estoppel did not apply because the first judgment related only to the period embraced by the evidence adduced at the first trial. 315 F.2d at 457. Unless it is shown that the condition found at a first trial is so permanent as to be unlikely to be disturbed, then we think offensive collateral estoppel may not be used with respect to that condition unless it be shown that the facts upon which the condition was based continued to exist. Such facts were not shown here, as the opinion of the district court pointed out.

We are thus of opinion that the district court did not err in its choice of law upon which its jurisdiction depended, and its judgment is

AFFIRMED.

MURNAGHAN, Circuit Judge, dissenting:

Before the decision in *Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970), the course which this case should have taken would have been simple enough. The plaintiff, customarily saddled with the burden of establishing a right to recovery, would have had to adduce

---

**2.** We should say at this point that the issue presented to us was not presented to the district court in quite the same context. We have examined, for example, the briefs filed with respect to the motion for judgment n.o.v. and do not find any reliance on *Parklane.* And that case is not relied upon here although its application is the controlling authority.

**1398**

evidence sufficient to establish all the elements of a cause of action under the Jones Act, 46 U.S.C. § 688.[1]

The *Rhoditis* adjudication changed the scenario to a significant degree. In *Rhoditis*, it was established in a trial in federal district court, was affirmed by a court of appeals, and was impressed with the *imprimatur* of the Supreme Court, that Hellenic Lines Ltd. ("Hellenic"), the same party defendant in a Jones Act case as the defendant in the case *sub judice*, was an "employer" for purposes of the Jones Act. The voluminous evidence marshalled in the *Rhoditis* litigation showed that Hellenic had

sufficient American contacts to bring its activities under the purview of the Act.

In my view the *Rhoditis* case should have been accorded presumptive collateral estoppel effect[2] by the district court, and the burden was Hellenic's to establish a change in circumstances since the *Rhoditis* litigation sufficient to relieve that adjudication of preclusive effect. By refusing to place that burden upon Hellenic and, instead, requiring the plaintiff, Dracos, to remake, if indeed not reinvent, the entire wheel, the majority has carried the concept of "changed circumstances" to an extreme that saps the collateral estoppel doctrine of its vitality. *Cf. Scooper Dooper, Inc. v.*

1. Those ingredients include not only proof of the requisite wrongful conduct, but also proof of American contacts sufficient to establish the applicability of the Jones Act to the defendant, Hellenic Lines Ltd. While the appellee and the district judge have referred to the issue of Hellenic's American contacts as one going to the subject matter jurisdiction of the district court, it seems more proper to recognize the issue as relating to the existence *vel non* of a cause of action. As would be the case with any statutory cause of action, a failure to establish that the statute applies to the set of facts presented would lead to a judgment on the merits against the plaintiff, and not to a dismissal for lack of subject matter jurisdiction. *See, e.g., Romero v. International Terminal Operating Co.,* 358 U.S. 354, 357 n. 4, 359, 381, 382 n. 53, 385, 79 S.Ct. 468, 472 n. 4, 473, 485, 485 n. 53, 487, 3 L.Ed.2d 769 (1959).

"As frequently happens where jurisdiction depends on subject matter, the question whether jurisdiction exists has been confused with the question whether the complaint states a cause of action." *Id.* at 359, 79 S.Ct. at 473. The Supreme Court's decision in *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), serves as the guide that will lead us out of the confusion. A well-pleaded complaint that arguably states a cause of action satisfies the subject matter jurisdiction requirement; upon further proof and consideration of the law, the cause of action might fail on its merits, but all the while subject matter jurisdiction remains undisturbed.

A parallel to the Sherman Act highlights the difference between subject matter jurisdiction and the cause of action itself. Read at face value, the Sherman Act condemns "[e]very contract ... in restraint of trade," 15 U.S.C. § 1; the Jones Act makes liable any "defendant employer" in a suit brought by "[a]ny seaman", 46 U.S.C. § 688. But just as an understanding of the Sherman Act's legal and policy heritage compels a conclusion that Congress

did not really intend to proscribe "every" contract that restrains trade, *e.g., Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *United States v. Joint-Traffic Assn.,* 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259 (1898), an understanding of the backdrop of the Jones Act compels a similar conclusion that not every "defendant employer" truly was intended to be governed by the Act's proscriptions. The common law doctrine of "ancillary restraints," for instance, early was seen as a limitation on the plain and widereaching language of the Sherman Act, *e.g., United States v. Addyston Pipe & Steel Co.,* 85 F. 271 (6th Cir.1898), aff'd, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899); the words of the Sherman Act, accordingly, had to be treated as terms of art. Similarly, longstanding principles of international comity and the traditions of admiralty practice inform and limit the plain, widereaching language of the Jones Act, rendering the words of that Act terms of art as well. *Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 314–15, 90 S.Ct. 1731, 1736–37, 26 L.Ed.2d 252 (1970) (Harlan, J., dissenting). An antitrust plaintiff who fails to establish that the contract he or she challenges is among those special contracts condemned by the Sherman Act plainly will suffer an unfavorable judgment on the merits. *E.g., Packard Motor Car Co. v. Webster Motor Car Co.,* 243 F.2d 418 (D.C.Cir.1957), *cert. denied,* 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957). So, too, should a Jones Act plaintiff lose on the merits, rather than see the case dismissed for want of jurisdiction, whenever he or she fails to establish that the employer he or she sues is among those special "defendant employer[s]" subject to the Act.

2. We need not, for present purposes, investigate to what extent "presumptive collateral estoppel" differs from, or merely is contained within, the concept of a failure to meet the burden of proving the opposite.

*Kraftco Corp.,* 494 F.2d 840, 846 (3d Cir. 1974) ("Rare would be the case in which counsel could not conjure up some factual element that had changed between adjudications.").

## I

Time can work changes, a fact noted by the majority and an observation as to which no reasonable mind could register dissent. The question to be resolved here, however, is whether the mere possibility of change—a truism—should be allowed to render meaningless a factual finding reached a dozen years before after full, fair and vigorous litigation which, at least as likely as not, is dispositive of the case currently before us. To that properly phrased question, I submit, there is but one answer.

## A

I have stated the question in terms of a mere possibility of change because, as a careful reading of the majority opinion will reveal, that is precisely what confronts us here. The linchpin of the majority's argument reads as follows:

> The dynamic nature of the shipping industry, with its constantly changing economic climate and regularly changing fleets, ports, and operations, indicates a changing factual situation that may require the choice of American law ... one year but may not require the same choice some years later.

*Ante,* at 1397. The majority's premise—that the shipping industry presents a constantly changing factual situation—is divined from nothing. No fact drawn from the record, no fact ascertainable by way of judicial notice, is summoned to set the shipping industry apart from the host of other industries implicated in litigation daily.

More importantly, the majority opinion, by abstracting the inquiry into one regarding an entire industry, fails to focus upon the relevant circumstances that are or are not so likely to change. It is not the entire shipping industry with which we primarily are concerned, but a specific business enterprise—Hellenic. Even less in the way of evidence suggests that Hellenic is a particularly volatile corporation subject to any change in circumstances that are pertinent here. Indeed, the evidence that we do have, along with the contentions of the parties here on appeal, is to the contrary. Of the circumstances established as pertinent by the Supreme Court in *Rhoditis* —i.e., the circumstances implicitly assumed to be rife for change in the majority opinion—particular consideration was paid to the fact that Hellenic's owner was a lawful permanent resident alien of the United States who had attained such status 18 years before that litigation. *Rhoditis,* 398 U.S. at 309, 90 S.Ct. at 1734. The owner's base of operations was New York, *id.* at 310, 90 S.Ct. at 1734, and the ship upon which the injury occurred was among several Hellenic ships "earning income from cargo originating or terminating here," *id.* at 310, 90 S.Ct. at 1734. Confronted with those circumstances, the *Rhoditis* Court could "see no reason whatsoever to give the Jones Act a strained construction so that this alien owner, engaged in an extensive business operation in this country, may have an advantage over citizens engaged in the same business by allowing him to escape the obligations and responsibility of a Jones Act 'employer.'" *Id.* 398 U.S. at 310, 90 S.Ct. at 1734.

As to those circumstances—the only circumstances that matter—what is there present in the record to support the proposition that change is anything more than a possibility? It is possible that, over the course of the twelve year period separating the *Rhoditis* decision and the present case, a change of ownership or a change in the owner's base of operations *might* have occurred. Certainly, though, it cannot be disputed that it is as likely that no change has occurred (or that any change has strengthened the plaintiff's case) as it is likely that change in fact has taken place which dictates a result different from that reached in *Rhoditis.*[3]

---

**3.** Hellenic contends that the owner in fact has

died. Brief for Appellee 25. The plaintiff con-

It is a possibility that Hellenic's fleet might no longer service the United States to the extent that it did in 1970. But we do know, from Hellenic's own contentions, that its fleet still services the United States and that, in fact, Hellenic still operates regularly from a pier in New York. Knowing that much, it can only be concluded that change is no more likely than no change.

The case, then, involves but a truism: It is merely possible, but by no means more likely than not, that Hellenic's circumstances have changed.

### B

The question properly stated, the answer easily follows. Where it is just as likely as not that circumstances have remained the same, where evidence of changed circumstances as a matter of fact is most readily available to the party against whom a prior judgment is asserted as collateral estoppel, and where there can be no question that the prior judgment was the product of a full, fair, and vigorous litigation, that prior judgment should be accorded presumptive collateral estoppel effect. The plaintiff was entitled to assert the *Rhoditis* decision and thus establish a *prima facie* case that Hellenic is a Jones Act "employer." The burden, then, properly shifted to Hellenic to come forth with facts pertinent to a real, and not hypothesized, change in circumstances sufficient to relieve the *Rhoditis* decision of preclusive effect. That Hellenic has not done.

Precisely such an approach is recommended by § 27 of the *Restatement (Second) of Judgments,* which, in pertinent part,[4] provides:

When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action ... whether on the same or a different claim.

The Restatement's drafters foresaw the difficulties that might arise due to a change in circumstances, and addressed the issue in comment c of § 27. Consistent with those scholars who have given the matter careful thought, *e.g.,* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4417, at 159–69 (1981), the drafters of the Restatement advocated a flexible approach to the problem of time and the probable changes it will work. Under their view, a prior adjudication should be given no effect only when "the bearing of the first determination is *so marginal because of the separation in time and other factors negating any similarity.*" § 27, comment c (emphasis supplied). Where some time has passed, but not so much time that the first determination can rationally be deemed impertinent—our case—the Restatement places the burden upon the party opposing the application of collateral estoppel to show that change has in fact occurred:

[I]n the absence of a showing of changed circumstances, a determination that, for

---

tends that the death of the owner is irrelevant because his death did not occur until after her cause of action accrued. Reply Brief for Appellant 7. The record, however, is silent. Lacking evidence, we can only surmise that pertinent change is no more likely than irrelevant change. There is no evidence bearing on who the successor owner or owners were, or what were their citizenships and residences.

The record, it is fair to say, is in a state of great uncertainty surrounding the entire matter. That further demonstrates the speculative nature of change supposed to exist on the mere basis of the passage of twelve years. Who bears the burdens associated with the speculative nature of time and the changes it brings is, as shall be seen, the critical matter we should address in a principled fashion.

4. Omitted from the quotation of the Restatement's text is its qualification that the subsequent action be one "between the parties" to the first litigation asserted to be preclusive. The requirement of mutuality, of course, has fallen by the wayside, *e.g., Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), as the drafters of the Restatement recommended, *Restatement (Second) of Judgments* § 29. Section 29 makes pellucidly clear that the existence *vel non* of a mutuality requirement has absolutely no bearing on the issue presented here, one involving only a question of possible change in factual circumstances as time has gone by.

example, a person was disabled, or a nonresident of the state, in one year will be preclusive with respect to the next as well. In other instances the burden of showing changed or different circumstances should be placed on the party against whom the prior judgment is asserted.

§ 27, comment c.

The Restatement, of course, binds no one. But it is persuasive. Good sense should control and the policy advocated in § 27 makes eminently good sense. There is a public interest in reducing needless litigation in our crowded and heavily pressed courts of the same question time and again, absent some real reason to believe that time has, indeed, brought change. The case against repetitive litigation is stronger where, as here, the necessary evidence is not easily available to the party seeking to invoke the prior litigation but readily at hand to the party who would urge a change of circumstances. Hellenic knows best what Hellenic does; if indeed Hellenic's circumstances have changed since 1970, then it is Hellenic who is best situated to demonstrate that fact.

Integral to collateral estoppel policy, as well, is the public interest in affording a party its day in court; the jurisprudence of due process does not permit otherwise. Placing the burden on Hellenic to establish some change in its circumstances, however, is just such an offer of a day in court. Whatever hardship the placing of such a burden upon Hellenic might produce is, I submit, negligible and, in any event, outweighed by the hardships that otherwise must be endured by the judicial system and parties such as the plaintiff here who should reasonably be able to rely as meaningful upon a valid and final judgment in an earlier case where the very same question was litigated.

## II

The district court, I conclude, abused its discretion in refusing to give any weight to the *Rhoditis* judgment, a determination which, absent proof of a change in Hellenic's circumstances, would have established the applicability of the Jones Act and necessitated a denial of defendant's motion for judgment n.o.v. And because there is absolutely no evidence in the record pointing to a change in circumstances, the judgment n.o.v. obviously must be reversed.

Rather than reinstating the jury's verdict for the plaintiff, however, we should remand the case for a new trial only on the issue of the applicability of the Jones Act— i.e., on the issue of Hellenic's American contacts. That disposition is required because Hellenic, relying upon the trial judge's ruling that the *Rhoditis* decision was of no use to the plaintiff, consequently offered no proof of any changed circumstances it might have had available.

Hellenic is entitled to its day in court on that matter, and a new trial restricted to the "contacts" question serves that end. At that trial, the plaintiff would be entitled to assert the *Rhoditis* decision to establish *prima facie* that Hellenic is a Jones Act "employer" with the requisite American contacts. Absent production of sufficient evidence to the contrary by Hellenic, judgment would be entered for the plaintiff on the verdict returned by the jury. Should Hellenic sustain its burden on the "contacts" question by showing a relevant change in circumstances, the *Rhoditis* decision would then have no bearing on the case here. In that event, unless plaintiff succeeds in proving anew American contacts sufficient to make Hellenic a Jones Act "employer" on the date the injury occurred, judgment for the defendant notwithstanding the verdict would be appropriate.