

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-26-1995

# Neely v Club Med

Precedential or Non-Precedential:

Docket 93-2069

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Neely v Club Med" (1995). *1995 Decisions.* Paper 198.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/198

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————————————

Nos. 93-2069 and 93-2102
—————————————

EILEEN ANNE NEELY,

Appellant in No. 93-2069

v.

CLUB MED MANAGEMENT SERVICES, INC.;
CLUB MED SALES, INC.;
CLUB MED, INC., Third-Party Plaintiffs;
HOLIDAY VILLAGE (ST. LUCIA), LTD.

v.

JOSEPH LEMAIRE,

Third-Party Defendant

Club Med Management Services, Inc. and
Holiday Village (St. Lucia) Inc.

Appellants in No. 93-2102

—————————————————

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 91-cv-07416)

—————————————————

Argued: August 8, 1994

Before: MANSMANN, COWEN, and McKEE, Circuit Judges.

—————————————————

Reargued in banc February 7, 1995

Before: SLOVITER, Chief Judge, BECKER, STAPLETON,
MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN,
NYGAARD, ALITO, ROTH, LEWIS, McKEE, and SAROKIN,

<u>Circuit Judges</u>.

(Filed    July 26, l995 )

M. KELLY TILLERY, ESQUIRE (ARGUED)
MICHAEL V. TINARI, ESQUIRE
BARRY L. COHEN, ESQUIRE
Leonard, Tillery & Sciolla
1515 Market Street, 18th Floor
Philadelphia, PA  19102

<u>Attorneys for Eileen Anne Neely</u>

BETTINA B. PLEVAN, ESQUIRE (ARGUED)
JOHN SIEGAL, ESQUIRE
MONIQUE A. TUTTLE, ESQUIRE
Proskauer, Rose, Goetz &
    Mendelsohn
1585 Broadway
New York, New York  10036

<u>Attorneys for Club Med Management
Services, Inc.; Club Med Inc.;
Holiday Village (St. Lucia), Ltd.</u>

LOUIS BELL
Marshall, Dennehey, Warner,
    Coleman & Goggin
1845 Walnut Street
Philadelphia, PA  19103

<u>Attorneys for Club Med Management
Services, Inc.; Holiday Village
(St. Lucia), Ltd.</u>

TABLE OF CONTENTS

Introduction  3

I.   Facts and Procedural History  7

II.  The <u>Lauritzen</u> Triad and Subject Matter Jurisdiction 13
      A.   The Non-Jurisdictional Nature of the <u>Lauritzen</u>
                    Choice-of-Law Analysis 13
      B.   Federal Question and Admiralty Jurisdiction 22
       1.   Federal Question Jurisdiction Under 28 U.S.C.
                    § 1331 22
       2.   Admiralty Jurisdiction Under 28 U.S.C. § 1333
                    24

III. Applicability of American Law Under the <u>Lauritzen</u> Triad 27

    A.    Introduction 27

    B.    Purposes of and Problems with the <u>Lauritzen</u> Analysis 29

    C.    The Two Steps of the <u>Lauritzen</u> Choice of Law Inquiry 32

       1.    Do the Contacts Show a Basis for Prescriptive Jurisdiction? 37

       2.    Are the Contacts Such That Application of American Law Would Be Reasonable? 41

          a.    Inaccessibility of a Foreign Forum 50

          b.    Law of the Forum 50

          c.    Place of the Wrongful Act 51

          d.    Place of Contract 55

          e.    Law of the Flag 56

          f.    Defendants' Allegiance, Bases of Operations, and Other Contacts with the United States 59

          g.    Domicile or Allegiance of the Injured Seaman 62

          h.    Summary and Conclusion 67

IV.    The Molding of the Verdict 69

    A.    Waiver of Comparative Causation on the Unseaworthiness Claim 71

    B.    Lack of Authority to Mold the Verdict 77

    C.    Joint and Several Liability 82

V.    Conclusion 83

---

OPINION OF THE COURT

---

BECKER, <u>Circuit Judge</u>.

INTRODUCTION

Plaintiff Eileen Anne Neely, a young American employed at a Club Med resort in St. Lucia, was seriously injured when she was sucked into the propellers of a scuba diving vessel, the <u>Long John</u>. Plaintiff was a member of the crew of the vessel, which was in St. Lucian coastal waters at the time of the accident.

She brought suit in the District Court for the Eastern District of Pennsylvania, and a jury there, responding to special interrogatories, found her employers negligent and the vessel unseaworthy, and awarded plaintiff a large verdict on her Jones Act, general maritime law, and maintenance and cure claims. Molding the verdict in response to post-trial motions, the court modified and substantially reduced the verdict by applying to the unseaworthiness claim the percentage of contributory negligence found by the jury with respect to the Jones Act claims. Then, on cross-appeals, a panel of this court, invoking Lauritzen v. Larsen, 345 U.S. 571, 73 S. Ct. 921 (1953), vacated the entire judgment for the plaintiff on the ground that the district court had lacked subject matter jurisdiction over the action. We granted rehearing in banc and vacated the panel opinion and judgment.

While the appeals present a large number of questions, we address only the subject matter jurisdiction, choice of law, and verdict molding issues.[0] With respect to subject matter jurisdiction, we conclude that the multi-factored analysis

---

[0]We find without merit and without need for discussion the defendants' contentions that there was insufficient evidence to support the jury's findings: (1) that defendant Club Med Management employed plaintiff; (2) that defendant Holiday Village was the owner pro hac vice of the Long John; and (3) that the unseaworthy condition of the Long John was a proximate cause of plaintiff's injuries. The same is true of plaintiff's contentions: (1) that the district court erred in submitting the issue of her contributory negligence to the jury (on the grounds of insufficient evidence); (2) that the court erred in its charge with respect to the defendants' denial of certain maintenance payments; and (3) that a new trial should have been granted because of the cumulative effect of discovery rule violations, prejudicial conduct by defense counsel, and "judicial misconduct."

4

established by Lauritzen, Romero v. International Terminal Operating Co., 358 U.S. 354, 79 S. Ct. 468 (1959), and Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 90 S. Ct. 1731 (1970) (together, the "Lauritzen triad"), governs choice of law, not subject matter jurisdiction, in Jones Act and American general maritime law claims. Then, applying the usual analyses for federal question and admiralty jurisdiction, we conclude that the district court had subject matter jurisdiction over this suit.

Turning our attention to the multi-factored "substantial contacts" test of the Lauritzen triad, we adopt a two-stage interpretation of that test, subjecting the Lauritzen factors to a relatively simple sufficiency test followed by a more involved reasonableness inquiry. We first find American maritime law potentially applicable in this case because the plaintiff is an American citizen. Accordingly, we consider whether applying American law is reasonable under the circumstances. Because the defendants did not inform the district court of the content of St. Lucian law, any interests St. Lucia might have in this case are undefined and, consequently, do little to render application of American law unreasonable. Additionally, in considering the significance of the various Lauritzen factors, we pay heed to the non-traditional context of this suit. By this we do not mean that the vessel involved here was unlike those in traditional, international shipping cases; rather, the activity here was non-traditional, for the Long John did not take its crew from sea to sea in pursuit of international commerce but rather only from beach to reef in aid of scuba diving adventures.

The accident occurred in St. Lucian waters, which as we explain is an important consideration in non-shipping contexts. And one of the defendants is a corporation organized under the laws of St. Lucia, a factor that also reflects some interest on the part of St. Lucia in applying its law. But these factors do not mean that American law may not be reasonably applied under the circumstances. Even when we add to these some evidence that the Long John, the vessel that injured plaintiff, was registered in St. Lucia, we cannot conclude that St. Lucia's interests, whatever they may be, are so threatened or so strong that America's interests must be ignored.

As our opinion explains, the United States has an overriding interest in assuring adequate compensation for its injured seamen. In the non-shipping context of this case, the significance of plaintiff's American allegiance is an especially important factor, and the relevance of the plaintiff's having entered into her employment contract in the United States is also enhanced. Conversely, the law of the flag of the Long John is of diminished importance in the non-traditional context, and, at all events, the law of the flag would be entitled to virtually no significance here both because there was no evidence that the Long John actually flew the flag of St. Lucia (or any other nation) and because the district court was presented with no information as to the content of St. Lucian law.

Additionally, two of the defendants are American corporations, the Long John was built in America to American specifications, and the St. Lucian defendant, whose operations

are in large measure run by one of its affiliated American co-defendants, derives the majority of its income from American tourists booked by another affiliated American co-defendant. Because the connections between this incident and the United States implicate significant American interests, and because consideration of all the circumstances confirms the reasonableness of applying United States law, we conclude that the contacts with the United States are "substantial," and American laws, both the Jones Act and our general maritime law, apply to this suit.

We also conclude that the district court erred in molding the verdict to apply the percentage of comparative negligence found by the jury with respect to the Jones Act claim to the unseaworthiness claim. We so hold because the defendants waived the issue, and because the court, which did not submit it to the jury, lacked authority to later make the omitted factual determinations sua sponte. We will therefore affirm the order of the district court holding two of the defendants liable under American law, but will vacate the district court's order of January 26, 1993, and direct it, on remand, to enter judgment for the plaintiff against Club Med Management and Holiday Village in the full amount of damages found by the jury, as more fully explained below.

## I. FACTS AND PROCEDURAL HISTORY

The defendants in this action are Club Med, Inc., Club Med Sales, Inc., and Club Med Management Services, Inc., all of which

have offices in New York, and Club Med, Inc.'s wholly owned subsidiary Holiday Village (St. Lucia) Ltd. Of the 10,000 to 15,000 people per year who vacation at the Club Med Holiday Village resort, approximately seventy to eighty percent come from the United States. Seventy to eighty percent of Holiday Village's annual income of approximately fifteen million dollars is generated by Holiday Village's American sales bureau, Club Med Sales.

Plaintiff is an American citizen domiciled in Telford (Montgomery County), Pennsylvania. After vacationing at a Club Med resort, she applied to Club Med for a position as a scuba diving instructor. Plaintiff was interviewed in New York by Club Med Management, a New York corporation. Following the interview, plaintiff received a letter of interest from the defendants, followed several months later by a phone call, initiated in New York by Club Med Management, offering her a position at Holiday Village, which she accepted. In early May of 1991, the defendants arranged and paid the travel expenses for her to go to Holiday Village in St. Lucia.

Plaintiff was hired to work as an "au pair" for a six-week period. She was not given a cash salary, but rather received room and board in exchange for her work. Once at Holiday Village, she served as either Scuba Diving Instructor or Divemaster on approximately thirteen or fourteen voyages from May 13 to May 23, 1991. She typically had trips twice in the morning and once in the afternoon. She was responsible for checking and preparing all equipment (which was stored aboard scuba diving

8

boats) for each voyage. During the trips, she provided instruction and warnings to the Club Med guests who would be diving.

The scuba expeditions on which plaintiff worked were conducted by a small fleet operated by Holiday Village. The fleet consisted of the Blue Lagoon, owned by Club Med, and the Long John, chartered by Holiday Village for use as a diving vessel from its title owner Joseph LeMaire (who lives in Miami, Florida but is not a United States citizen). A declaration executed by LeMaire claimed that the Long John, which was built in the United States, was "registered" in St. Lucia, but the charter left blank the state of registry.

On May 23, 1991, plaintiff served Club Med guests on a scuba diving excursion on the Long John, which was captained by Philipe Le Cann. When the boat arrived at the dive site in coastal waters off St. Lucia, the passengers and dive crew prepared to enter the water. The boat was put in neutral, and, after donning her gear, plaintiff entered the water.

It was disputed whether Stephane Gaudry, the Divemaster, had given the signal to enter the water before plaintiff jumped in: the uncontroverted testimony was that Gaudry made no entry of plaintiff's dive time on the dive log. Whatever the precise sequence of events, after plaintiff had entered the water, the captain put the ship's engines into reverse. The churning propellers of the twin 350 horsepower diesel engines sucked plaintiff under the boat and into the ship's propellers, which were not shielded by propeller guards, and she emerged on the

9

starboard side with extremely serious injuries to various parts of her body. She was brought on board the ship, taken immediately to shore, and thereafter to a clinic and then a hospital.

After being treated, plaintiff was out of work for approximately five and one half months. During this time, she convalesced at her parents' home in Telford, where they cared for her on a daily basis. Despite two surgeries for nerve damage, her use of her right arm was permanently restricted; she also will require plastic surgery for her numerous conspicuous scars.

Plaintiff eventually brought suit in the District Court for the Eastern District of Pennsylvania, pleading the federal question and admiralty statutes, 28 U.S.C. §§ 1331 and 1333 (1988), as bases for subject matter jurisdiction. She alleged that her injuries were caused by negligence in violation of the Jones Act, and by the unseaworthy condition of the vessel in violation of the general maritime law. The defendants interposed a host of defenses, including contributory negligence and, relying on Lauritzen v. Larsen, 345 U.S. 571, 73 S. Ct. 921 (1953), and Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 90 S. Ct. 1731 (1970), the claim that the district court lacked subject matter jurisdiction to apply American law. Although they argued that St. Lucia had a greater interest in having its law applied, the defendants did not present the court with any information concerning the law of St. Lucia.

The district court denied defendants' motion to dismiss for lack of subject matter jurisdiction and failure to state a claim,

and allowed the suit to go to trial. During trial, the court ruled, without objection from the defendants, that contributory negligence was not a defense to the unseaworthiness claim. At the close of trial, the court instructed the jury and provided it with a special verdict form, the first draft of which had been prepared by defense counsel. The form required the jury to answer a number of specific questions, grouped and captioned as we now describe.

The first set of questions were presented under the heading "Jones Act Claim." In these, the jury was asked whether plaintiff was employed by one or more of the defendants; if so, which defendant or defendants were her employer; whether her employer or employers were negligent; whether any such negligence was a substantial factor in bringing about plaintiff's injuries; whether plaintiff was contributorily negligent; whether any such contributory negligence was a substantial factor in bringing about her injuries; and how the causal negligence should be allocated (totalling 100%) among the employer or employers and, if appropriate, the plaintiff.

The second set of questions were grouped under the caption "General Maritime Claim." In this section of the form the jury was required to answer whether any of the defendants owned or sufficiently controlled the Long John to qualify as owner or owner pro hac vice; if so, which defendant(s) controlled the vessel; whether the plaintiff had shown that the vessel was unseaworthy; and if so, whether the unseaworthiness was a

11

substantial factor contributing to plaintiff's injuries. This section asked no questions about contributory responsibility.

The third section of the special verdict sheet was labeled "Damages." The jury was there directed to "[s]tate the amount of damages, if any, sustained by the Plaintiff as a result of the accident, without regard to and without reduction by the percentage of causal negligence, if any, that you have attributed to the plaintiff."

The fourth and final portion of the verdict sheet was captioned "Maintenance." There, the jury was asked whether it found the plaintiff entitled to maintenance, and whether any of the defendants (and, if so, which) acted unreasonably in denying maintenance to her.

On the Jones Act questions, the jury found that plaintiff was employed by Club Med Management and by Holiday Village, that those defendants had been negligent, and that their negligence was a substantial factor in causing the plaintiff's injuries. The jury also found, however, that the plaintiff was contributorily negligent. It allocated the total causal negligence thirty percent to Club Med Management, ten percent to Holiday Village, and sixty percent to the plaintiff. In answer to the General Maritime Law questions, the jury found that Holiday Village exercised sufficient control over the Long John to be its owner pro hac vice. It also found the Long John to have been unseaworthy, and that the unseaworthiness was a substantial factor causing plaintiff's injuries.

12

On the remaining questions, the jury found the plaintiff's total damages sustained from the accident, without regard to any causal negligence on her own part, to be $545,000. It also found that the plaintiff was entitled to maintenance, but that none of the defendants had acted unreasonably in withholding payment. Thereupon, the district court molded the verdict to reflect plaintiff's comparative negligence: On the Jones Act claim, the court entered judgment against Club Med Management and Holiday Village in the amount of forty percent of $545,000, that is, $218,000. On the maintenance claim, the court entered judgment against the same defendants for $11,700, but denied attorney's fees to plaintiff because the jury had found that the denial of maintenance was not unreasonable. On the unseaworthiness claim, the court entered judgment in plaintiff's favor against Holiday Village in the full amount of $545,000.

A week later the defendants moved the district court to mold the verdict on the unseaworthiness claim. Relying upon case law holding that comparative fault is a partial defense to general maritime law unseaworthiness claims, the defendants urged the district court to reduce the unseaworthiness verdict by sixty percent, the percentage of the plaintiff's contributory negligence on the Jones Act claim. Over plaintiff's objection, the district court entered an order so modifying the judgment.

Plaintiff filed a timely appeal, and defendants cross-appealed. Under 28 U.S.C. § 1291 (1988), we have appellate jurisdiction over the final orders of the district court.

13

II. THE LAURITZEN TRIAD AND SUBJECT MATTER JURISDICTION

Beginning with their initial answer in the district court, the defendants have argued that, pursuant to the multi-factored analysis developed in Lauritzen v. Larsen, 345 U.S. 571, 73 S. Ct. 921 (1953), and Hellenic Lines, Ltd. v. Rhoditis, 398 U.S. 306, 90 S. Ct. 1731 (1970), the district court lacked subject matter jurisdiction over plaintiff's Jones Act and general maritime law unseaworthiness claims. Because subject matter jurisdiction restrictions impose a limit on the power of the federal courts to entertain an action, we must first consider whether the district court had subject matter jurisdiction over plaintiff's suit. If the district court lacked such jurisdiction, it would be our duty to vacate the judgments in plaintiff's favor and direct the district court to dismiss her action.

We hold that the district court had subject matter jurisdiction over this suit. This ruling primarily reflects a disagreement with defendants' premise that the Lauritzen triad (composed of Lauritzen, Rhoditis, and Romero v. International Terminal Operating Co., 358 U.S. 354, 79 S. Ct. 468 (1959)) provides the framework for determining whether a district court has subject matter jurisdiction in Jones Act or general maritime law cases.

A.  The Non-Jurisdictional Nature of the

Lauritzen Choice-of-Law Analysis

In Lauritzen v. Larsen, 345 U.S. 571, 73 S. Ct. 921 (1953), the Supreme Court enunciated a number of factors to be considered

by courts evaluating whether a plaintiff may sue under the Jones Act. These factors include:

    (1) the place of the wrongful act,
    (2) the law of the flag,
    (3) the allegiance or domicile of the injured plaintiff,
    (4) the allegiance of the defendant,
    (5) the place of contract,
    (6) the inaccessibility of a foreign forum, and
    (7) the law of the forum.

See Lauritzen, 345 U.S. at 583–92, 73 S. Ct. at 928–33. The Court reiterated the relevance of these factors in Romero, see 358 U.S. at 383, 79 S. Ct. at 486, and in Hellenic Lines, Ltd. v. Rhoditis, 398 U.S. 306, 90 S. Ct. 1731 (1970), it added the defendant's base of operations to this list, id. at 309, 90 S. Ct. at 1734.

Defendants believe that this inquiry determines whether the district court has subject matter jurisdiction. This view was not challenged in the district court, which considered the factors and found subject matter jurisdiction, or before the panel, which reconsidered them but found no jurisdiction. Moreover, a number of cases in various jurisdictions so hold. However, after granting rehearing in banc, we sua sponte directed the parties to prepare supplemental briefing on the question whether the Lauritzen–Romero–Rhoditis factors (henceforth referred to as the "Lauritzen factors" for simplicity) in fact go to subject matter jurisdiction. With the benefit of counsel's briefing and argument, and after studying the Supreme Court's opinions and numerous cases interpreting them, we conclude that the Lauritzen factors are not a test for subject matter jurisdiction, but rather constitute a non-exhaustive list of

15

contacts for choice of law analysis in suits for maritime injuries with foreign connections.

In Lauritzen, the Supreme Court was called on to answer a question of the extraterritorial applicability of the Jones Act. While in New York, Larsen, a Danish seaman, had signed onto a ship of Danish flag and registry owned by Lauritzen, another Danish citizen. The ship's articles that Larsen signed were written in Danish and specified that Danish law would govern the crewmembers' rights. After being injured in the course of his employment while in Havana harbor, Larsen brought suit against Lauritzen in the District Court for the Southern District of New York, seeking to recover damages under the Jones Act. Over Lauritzen's objection that Danish law rather than American law governed, the district court allowed the case to go to the jury under the Jones Act, which rendered a verdict in Larsen's favor. The Court of Appeals for the Second Circuit affirmed, and the Supreme Court granted certiorari.

The Court formulated the "key issue" as "whether statutes of the United States should be applied to this claim of maritime tort." Lauritzen, 345 U.S. at 573, 73 S. Ct. at 923. As did the defendants herein, Lauritzen had framed his objection in terms of subject matter jurisdiction, but the Court quickly disposed of this argument:

> The question of jurisdiction is shortly answered. . . . As frequently happens, a contention that there is some barrier to granting plaintiff's claim is cast in terms of an exception to jurisdiction of subject matter. A cause of action under our law was asserted here, and the court had power to determine whether it was or was not well founded in law and in fact.

Id. at 574, 73 S. Ct. at 924. Thus, the Court's later analysis introducing the now-famous Lauritzen factors was directed to choice of law, see id. at 583, 73 S. Ct. at 928, not subject matter jurisdiction, which the Court had already determined was present.

Similarly, in Romero v. International Terminal Operating Co., 358 U.S. 354, 79 S. Ct. 468 (1959), the Court faced suit brought under American law by a foreign sailor. Romero, a Spanish seaman, had signed onto the crew of a vessel of Spanish registry that sailed under the Spanish flag and was owned by a Spanish corporation. After departing from a Spanish port, the ship made numerous stops, including one in Hoboken, where Romero was injured when struck by a cable on the ship's deck. He filed suit in the District Court for the Southern District of New York, contending inter alia that the shipowner ("Compania") was liable to him under the Jones Act and under the general maritime law of the United States for unseaworthiness of the ship, maintenance and cure, and maritime tort. The alleged bases for jurisdiction were the Jones Act, federal question jurisdiction, and diversity jurisdiction.

The district court dismissed the complaint after a pre-trial hearing. It concluded that the Jones Act provided no right of action to an alien seaman under the circumstances involved, and thus that the court lacked jurisdiction over the Jones Act claim against Compania. The court dismissed the general maritime claim against the corporation because the company was not of diverse citizenship from Romero and because of its conclusion that the

17

federal question statute did not embrace general maritime law claims.

The Court of Appeals affirmed the dismissal of the complaint, and the Supreme Court granted certiorari. In Part I of its opinion, entitled "Jurisdiction," id. at 359, 79 S. Ct. at 473, the Court concluded that the district court possessed subject matter jurisdiction of the claims. With respect to the Jones Act claims, it noted:

> [T]he question whether jurisdiction exists has been confused with the question whether the complaint states a cause of action. Petitioner asserts a substantial claim that the Jones Act affords him a right of recovery for the negligence of his employer. Such assertion alone is sufficient to empower the District Court to assume jurisdiction over the case and determine whether, in fact, the Act does provide the claimed rights.

Id. (internal quotation marks and citation omitted). The Court then affirmed Lauritzen's holding that the usual federal question approach to subject matter jurisdiction governs Jones Act suits. See id.[0]

Importantly, the Romero Court turned to the Lauritzen factors (in Part II of its opinion, entitled "The Claims Against Compania Transatlantica--The Choice-of-Law Problem," id. at 381, 79 S. Ct. at 485) only after concluding that the district court had erred in dismissing Romero's suit for lack of subject matter jurisdiction. Thus, the Court's decision in Romero confirms that

---

[0]The issue of subject matter jurisdiction over the unseaworthiness and general maritime law tort claims was more complicated due to the procedural posture of the case, which preceded the 1966 procedural unification of the civil and admiralty "sides" of federal district court. We note here only that the Supreme Court held that where plaintiffs properly alleged a Jones Act claim, the district court might exercise "pendent jurisdiction" to determine whether they also properly stated a general maritime law cause of action, even if the complaint was not filed as a libel in admiralty. For further discussion, see GRANT GILMORE & CHARLES L. BLACK, JR., THE LAW OF ADMIRALTY § 6-62 (2d ed. 1975).

18

the Lauritzen factors are <u>not</u> a test for subject matter jurisdiction but rather govern choice of law.  The innovation in <u>Romero</u> was its pronouncement that the <u>Lauritzen</u> analysis should govern not only Jones Act claims but also claims under the general maritime law for personal injury damages.  <u>Id.</u> at 382, 79 S. Ct. at 485.

Our understanding of these precedents is confirmed by a leading admiralty treatise.  <u>See</u> Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty § 6-63 (2d ed. 1975) [hereinafter Law of Admiralty].  Discussing "Choice of Law in Actions Brought in the United States by Seamen Injured on Foreign-Flag Ships," the authors explain that when "a seaman brings an action to recover for personal injuries, the court must initially decide whether it has jurisdiction and, if it has, whether United States law or the law of a foreign nation is applicable."  <u>Id.</u> at 471.  They go on to discuss <u>Lauritzen</u> and <u>Romero</u> as follows:

> The majority of the Court concluded that neither the situs of the injury nor Romero's treatment in this country made a case, under the <u>Lauritzen</u> criteria, for application of American law in Romero's action against his employer, the Spanish Line.  Justice Frankfurter's opinion emphasized that <u>the issue was one of choice of law and not of subject matter jurisdiction</u>.  That is, the District Court, having decided that Romero's action against his employer was not governed by American law, could have retained jurisdiction of the action and decided it under Spanish law.

<u>Id.</u> at 473 (emphasis supplied).[0]

The Supreme Court's third and latest pronouncement on the role of the <u>Lauritzen</u> factors came in 1970.  While the Court's

---

[0]The district court had chosen as a matter of discretion not to exercise admiralty jurisdiction over any claims that Romero might have under Spanish law.  <u>See</u> <u>id.</u> at 358, 79 S. Ct. at 472. <u>See also</u> <u>infra</u> note 30.

19

opinion in Hellenic Lines, Ltd. v. Rhoditis, 398 U.S. 306, 90 S. Ct. 1731 (1970), is partially opaque, it does not signal a change in the purpose and use of the Lauritzen analysis. Rhoditis concerned a suit under the Jones Act by a Greek seaman for injuries he suffered aboard a ship in the Port of New Orleans. Because the Supreme Court agreed with the trial and appellate courts that the Jones Act applied, the Court did not need to differentiate between subject matter jurisdiction and the plaintiff's entitlement to proceed under the Jones Act--both were present. But the opinion's description of the Lauritzen analysis makes clear that the Court viewed the factors as bearing on applicability of the Act, rather than subject matter jurisdiction.

The Court explicitly endorsed the description of the Lauritzen analysis offered by Judge Medina, who in Bartholomew v. Universe Tankships, Inc., 263 F.2d 437 (2d Cir. 1959), had written:

> [T]he decisional process of arriving at a conclusion on the subject of the application of the Jones Act involves the ascertainment of the facts or groups of facts which constitute contacts between the transaction involved in the case and the United States, and then deciding whether or not they are substantial.

Id. at 441 (quoted in Rhoditis, 398 U.S. at 309 n.4, 90 S. Ct. at 1734 n.4) (emphasis supplied here). Furthermore, in adding the shipowner's base of operations to the analysis, the Court characterized it as "another factor of importance in determining whether the Jones Act is applicable." Rhoditis, 398 U.S. at 309, 90 S. Ct. at 1734 (emphases supplied).

It is true that the Court's opinion in Rhoditis twice used the word "jurisdiction."[0] However, the presence of two occurrences of the word "jurisdiction" is too ambiguous to mandate a change in the jurisprudence,[0] particularly since the Court likely meant to refer to "legislative jurisdiction," see id. at 314 & n.2, 90 S. Ct. at 1736–37 & n.2 (Harlan, J., dissenting) (which is also known as prescriptive jurisdiction,

_____

[0]"Of these seven factors, it is urged that four are in favor of the shipowner and against jurisdiction." Id. at 308, 90 S. Ct. at 1733. See also id. at 309, 90 S. Ct. at 1734 (referring to "the national interest served by the assertion of Jones Act jurisdiction").

[0]One district court has suggested that perhaps the Supreme Court's reference to "Jones Act jurisdiction" was not "intended to overrule Lauritzen and Romero," but rather was "merely an unguarded and passing dictum." Karvelis v. Constellation Lines SA, 608 F. Supp. 966, 968 n.2, aff'd, 806 F.2d 49 (2d Cir. 1986). In this regard, we take special note of Rodriguez v. Flota Mercante Grancolombiana, S.A., 703 F.2d 1069 (9th Cir. 1983), which is one of very few reported cases to attempt a careful analysis of the nature of the Lauritzen inquiry. In Rodriguez, the court of appeals rejected a Colombian seaman's attempt to sue his employer (a Colombian corporation based in Colombia) under the Jones Act. But, as then-Judge Kennedy recognized in a separate concurrence, the majority went astray when it read Rhoditis as authorizing a district court to dismiss a Jones Act case for lack of subject matter jurisdiction when the Lauritzen factors do not support application of American law. See id. at 1072. Judge Kennedy agreed that the plaintiff failed to state a claim under the Jones Act but wrote separately "to call attention to a conceptual problem in these cases, namely, whether to characterize an unsuccessful Jones Act claim as lacking in subject matter jurisdiction or as failing to state a cause of action." Id. at 1075. Judge Kennedy believed that the Supreme Court's reference in Rhoditis to "jurisdiction" was "only a passing and unguarded remark." Id. at 1076. After reviewing Lauritzen, Romero, and several Court of Appeals cases, Judge Kennedy concluded that Lauritzen analysis does not go to subject matter jurisdiction, for "the issue is whether or not there is a failure to state a claim, and we resort to choice of law principles to answer the question." Id. See also Dracos v. Hellenic Lines Ltd., 705 F.2d 1392, 1397–98 & n.1 (4th Cir. 1983) (Murnaghan, J., dissenting) (properly analyzing Lauritzen factors as choice of law contacts, not subject matter jurisdiction factors), on reh'g, 762 F.2d 348 (1985) (en banc).

21

see RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW Pt. IV, at 230 (1987)).

Moreover, subject matter jurisdiction was not presented in the

Questions for Review in the petition for certiorari. See

Petition for Writ of Cert. at 2-3, Hellenic Lines Ltd. v.

Rhoditis, 412 F.2d 919 (5th Cir. 1969) (No. 661), cert. granted,

396 U.S. 100, 90 S. Ct. 554 (1970). Rather, the first Question,

which is characteristic, was:

> Were the lower courts correct in applying the Jones Act to
> an action by a Greek seaman, himself a resident of Greece,
> against a Greek corporate owner for injury occurring aboard
> a Greek flag vessel, solely on the ground that the majority
> stock holder of the corporate ship owner, although himself a
> Greek citizen, resided in the United States as a
> representative of Greece to the United Nations.

Id. (emphasis supplied).

Moreover, treating the Lauritzen analysis as going to

subject matter jurisdiction would be out of keeping with the

approach of most jurisdictional inquiries, which tend to be

straightforward threshold questions. "The dangers of a totality-

of-the-circumstances approach to jurisdiction would be obvious.

An undefined test requires courts and litigants to devote

substantial resources to determine whether a federal court may

hear a specific case." Jerome B. Grubart, Inc. v. Great Lakes

Dredge & Dock Co., 115 S. Ct. 1043, 1057 (1995) (Thomas, J.,

concurring in the judgment). The federal judiciary "pursues

clarity and efficiency in other areas of federal subject-matter

jurisdiction, and it should demand no less in admiralty and

maritime law." Id. at 1059.

Thus, we conclude that the multi-factored analysis of

Lauritzen, Romero, and Rhoditis is not to be used to determine

22

whether a district court has subject matter jurisdiction over suits brought under the Jones Act or the general maritime law. Insofar as Matute v. Lloyd Bermuda Lines, Ltd., 931 F.2d 231 (3d Cir. 1991), holds that the Lauritzen factors govern subject matter jurisdiction over Jones Act or general maritime law claims, it is overruled. In so ruling, we agree with the cases from other circuits that have used the Lauritzen analysis to determine choice of law, not subject matter jurisdiction. See, e.g., Schexnider v. McDermott Int'l, Inc., 817 F.2d 1159 (5th Cir. 1987) (affirming district court's determination that Lauritzen dictated applicability of Australian law but requiring that district court retain jurisdiction and try the case); cf. also supra note 21 (citing concurring and dissenting opinions that correctly apprehend the issue). Concomitantly, we necessarily disagree with those cases from other circuits holding (without addressing the clear force of Romero) that the Lauritzen analysis may be used to dismiss a Jones Act claim for lack of subject matter jurisdiction. See, e.g., Gutierrez v. Diana Investments Corp., 946 F.2d 455, 456-57 (6th Cir. 1991) (per curiam) (affirming dismissal of suit for lack of subject matter jurisdiction flowing from non-applicability of American law under Lauritzen analysis); Dracos v. Hellenic Lines, Ltd., 762 F.2d 348, 349-50 (4th Cir. 1985) (en banc) (same);[o] Rodriguez v. Flota

_____

[o]While Dracos did cite Romero, the en banc majority read it as merely holding that federal courts have jurisdiction to consider their own jurisdiction. See Dracos, 762 F.2d at 350 (citing Romero, 358 U.S. at 359, 79 S. Ct. at 473). As our foregoing discussion shows, this is not what Romero holds.

23

Mercante Grancolombiana, S.A., 703 F.2d 1069, 1071-72 (9th Cir. 1983) (same).

B.  Federal Question and Admiralty Jurisdiction

Although we have demonstrated that the Lauritzen inquiry is non-jurisdictional in nature, there remains the question whether the district court had subject matter jurisdiction over plaintiff's claims, which the defendants have contested throughout this litigation.  We conclude that it did, under both the federal question and the admiralty jurisdiction statutes.

1.  Federal Question Jurisdiction Under 28 U.S.C. § 1331

In its first Jones Act case, the Supreme Court held that the Jones Act, as a federal statute providing remedies for injured seamen, is subject to the usual rule for "arising-under" jurisdiction.  See Panama R.R. Co. v. Johnson, 264 U.S. 375, 383-84, 44 S. Ct. 391, 392 (1924) ("This case arose under a law of the United States [i.e., the Jones Act] and involved the requisite amount, if any was requisite; so there can be no doubt that the case was within the general jurisdiction conferred on the district courts by [the federal question statute] . . . ."); see also Hartford Fire Ins. Co. v. California, 113 S. Ct. 2891, 2917 (1993) (Scalia, J., dissenting in part) (discussing Lauritzen and distinguishing subject matter jurisdiction from applicability of American law).

Section 1331 provides that the federal "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (1988).  "The question of whether the district

24

court had subject matter jurisdiction pursuant to [the Jones Act] is not whether [plaintiff] had a <u>valid</u> cause of action against the [defendants] under federal . . . law.  Rather, the subject matter jurisdiction analysis is one of whether the determination of the existence <u>vel non</u> of that cause of action is a question 'arising under the . . . laws . . . of the United States.'" <u>Airco Indus. Gases, Inc. v. Teamsters Health & Welfare Pension Fund</u>, 850 F.2d 1028, 1032 (3d Cir. 1988).  Plaintiff clearly meets that standard, for whether she could assert claims under the Jones Act and general maritime law is a question of federal law.    The district court clearly had jurisdiction over plaintiff's Jones Act claims.[0]

## 2.   Admiralty Jurisdiction Under 28 U.S.C. § 1333

Plaintiff's remaining claims against the defendants allege violations of the general maritime law duty to provide a seaworthy vessel.  Again, although the <u>Lauritzen</u> factors are to be used in determining the applicability of substantive American maritime law, they do not go to subject matter jurisdiction. Rather, for non-statutory causes of action, we apply the customary admiralty jurisdiction analysis of <u>Executive Jet Aviation, Inc. v. City of Cleveland</u>, 409 U.S. 249, 93 S. Ct. 493 (1972), <u>Foremost Ins. Co. v. Richardson</u>, 457 U.S. 668, 102 S. Ct. 2654 (1982), and <u>Sisson v. Ruby</u>, 497 U.S. 358, 110 S. Ct. 2892

---

[0]Defendants do not contend, nor could they, that the district court lacked subject matter jurisdiction on the ground that plaintiff's Jones Act claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or [that her] claim is wholly insubstantial and frivolous." <u>Bell v. Hood</u>, 327 U.S. 678, 682–83, 66 S. Ct. 773, 776 (1946).

25

(1990), as recently reaffirmed in <u>Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.</u>, 115 S. Ct. 1043 (1995).

"[A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity." <u>Id.</u> at 1048. For tort claims, the locality test requires that "the tort occurred on navigable water or . . . injury suffered on land was caused by a vessel on navigable water." <u>Id.</u> Here, the locality test is "readily satisfied," <u>id.</u> at 1049, for plaintiff's injuries occurred in navigable waters and were caused there by a vessel, <u>see</u> <u>id.</u> at 1048.

The maritime connection inquiry is two-fold. First, we "assess the general features of the type of incident involved to determine whether the incident has a potentially disrupting impact on maritime commerce." <u>Id.</u> (internal citations and quotation marks omitted). Second, we "determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." <u>Id.</u> (internal citations and quotation marks omitted).

With respect to the potential disruption prong, we describe the incident "at an intermediate level of possible generality." <u>Id.</u> at 1051. Following the Supreme Court's lead, the "general features of the incident at issue here may be described as damage by a vessel in navigable water to [a seaman]." <u>Id.</u>[0] "So

_____

[0]On appeal, the defendants did not challenge plaintiff's seaman status, which flowed from her being a crewmember of the vessels in the Club Med fleet, and which we accordingly take as given for purposes of this case. <u>Cf.</u> <u>Chirinos de Alvarez v. Creole Petroleum Corp.</u>, 613 F.2d 1240, 1245 n.5 (3d Cir. 1980).

26

characterized, . . . this is the kind of incident that has a potentially disruptive impact on maritime commerce." Id. Injury to a seaman in navigable waters "could lead to restrictions on the navigational use of the waterway," id., during necessary investigations into the accident, which could be especially lengthy in a case where the seaman's injuries proved fatal. Additionally, a vessel's need to replace an incapacitated seaman could lead to delays in commercial shipping. Although this case involves a pleasure boat rather than a vessel engaged in commercial shipping, that fact does not affect the jurisdictional result. In Sisson v. Ruby, the features of the incident were described as "a fire on a vessel docked at a marina on navigable waters," 497 U.S. at 363, 110 S. Ct. at 2896, even though the "vessel" was a pleasure boat.

The second prong of the maritime connection test is also easily met here. "In the second Sisson enquiry, we look to whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." Jerome B. Grubart, Inc., 115 S. Ct. at 1051. "Navigation of boats in navigable waters clearly falls within the substantial relationship . . . ." Id. Thus, the travels of the Long John qualify despite the short distances involved in its voyages. Cf. Sinclair v. Soniform, Inc., 935 F.2d 599, 600 (3d Cir. 1991) (upholding admiralty jurisdiction over claim arising from failure of crew of vessel that transported plaintiff to detect symptoms of and administer proper care for decompression sickness suffered during scuba diving investigation in navigable

27

waters); see also 1 STEVEN F. FREIDELL, BENEDICT ON ADMIRALTY § 171, at 11-22 to -23 nn.54-56 (7th ed. rev. 1995) (citing cases finding admiralty jurisdiction over claims that navigation errors or negligent operation of vessel injured others) [hereinafter BENEDICT ON ADMIRALTY].  Since the locality and maritime connection tests were clearly met, the district court had admiralty jurisdiction over plaintiff's claims.[0]

---

[0] In so holding we note that the Supreme Court has not been receptive to defendants' arguments that "virtually every activity involving a vessel on navigable waters would be a traditional maritime activity sufficient to invoke maritime navigation." Jerome B. Grubart, Inc., 115 S. Ct. at 1052 (internal quotation marks omitted).  Nor has the Court departed far from the situs test for admiralty jurisdiction, see id. at 1052-53, but rather has "simply . . . reject[ed] a location rule so rigid as to extend admiralty to a case involving an airplane, not a vessel, engaged in an activity far removed from anything traditionally maritime." Id. at 1053. Although not "every tort involving a vessel on navigable waters falls within the scope of admiralty jurisdiction no matter what, . . . ordinarily that will be so." Id.  This case lacks any exceptional circumstances that could take it out of the ordinary run.  Accordingly, plaintiff's general maritime law claims come within the federal courts' admiralty jurisdiction.

Additionally, although diversity or alienage were not pled as bases for the district court's jurisdiction over Neely's claims against Club Med Management and Holiday Village, the amount in controversy has at all times easily exceeded $50,000, and so the facts show that the district court had diversity jurisdiction, 28 U.S.C. § 1332(a)(1) (1988), over the claims of Neely (a Pennsylvania citizen) against Club Med Management (a New York corporation), and Club Med Sales (a Delaware corporation), and alienage jurisdiction, 28 U.S.C. § 1332(a)(2) (1988), over the claims against Club Med, Inc. (a Cayman Islands corporation) and Holiday Village (a St. Lucian corporation).  By statute, we are authorized to permit amendment to the complaint to correct defective allegations.  See 28 U.S.C. § 1653 (1988) ("Defective allegations of subject matter jurisdiction may be amended, upon terms, in the trial or appellate courts.").  Thus, if we had doubts whether the plaintiff's general maritime law claims fell within the district court's admiralty jurisdiction, we could permit amendment (as plaintiff has requested) to avoid the great waste of judicial resources that would otherwise attend the plaintiff's having alleged only two bases for jurisdiction (federal question and admiralty), rather than three (those plus

28

III. Applicability of American Law Under the Lauritzen Triad

A. Introduction

The questions whether American law actually applies under the Lauritzen triad, and if so whether the facts entitle the plaintiff to recover, arise only when, as here, a district court has subject matter jurisdiction over a Jones Act or American general maritime law claim. Moreover, Lauritzen analysis is a choice of law methodology, and, like a plaintiff's need to prove one or more of the specific statutory elements of his or her claims, choice of law issues may be waived.[0] Thus, if defendants

<hr/>

diversity). Cf. Local No. 1 (ACA) Broadcast Employees of Int'l Bhd. of Teamsters v. International Bhd. of Teamsters, 614 F.2d 846 (3d Cir. 1980) (allowing plaintiff to amend complaint to cure defective jurisdictional allegations). We therefore need not rely on the doctrine that where plaintiffs invoke federal question jurisdiction to bring a Jones Act suit, federal district courts have "pendent" jurisdiction over parallel unseaworthiness claims. See, e.g., Romero, 358 U.S. at 380–81, 79 S. Ct. at 484–85; Hagans v. Lavine, 415 U.S. 528, 548 n.14, 94 S. Ct. 1372, 1385 n.14 (1974) (recognizing existence of this doctrine); 28 U.S.C. § 1367 (Supp. V 1993) (generally granting district courts "supplemental jurisdiction over all other claims that are so related to claim in the action within [the district courts'] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution").

[0]See, e.g., Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1005 n.1 (3d Cir. 1980); Bagdon v. Bridgestone/Firestone, Inc., 916 F.2d 379, 383 (7th Cir. 1990); Corrugated Paper Prods., Inc. v. Longview Fibre Co., 868 F.2d 908, 910 n.2 (7th Cir. 1989); R.L. Clark Drilling Contractors, Inc. v. Schramm, Inc., 835 F.2d 1306, 1308 (10th Cir. 1987); Gilchrist v. Jim Slemons Imports, Inc., 803 F.2d 1488, 1497 (9th Cir. 1986); Bilancia v. General Motors Corp., 538 F.2d 621, 622–23 (4th Cir. 1976). See also Larry Kramer, Rethinking Choice of Law, 90 Colum. L. Rev. 277, 284 (1990) ("It is the parties' responsibility to call a choice of law issue to the court's attention. If plaintiff bases his claim on inapplicable law (i.e., a law that does not give plaintiff a right to relief), the defendant must notify the court in a motion to dismiss or a motion for directed verdict. Failure to make a timely motion

do not argue that American law is inapplicable as a matter of choice of law, the court will not analyze the Lauritzen factors. The plaintiff would need only to prove the particular elements of the cause of action, such as seaman status, employer status, negligence, causation, and damages (for a Jones Act case).

When a defendant does raise the Lauritzen issue, a plaintiff suing for personal injury damages under American maritime law must, as with any other cause of action, both establish the applicability of the law under which the case was brought and prove the elements of the other nations.⁰ary course, fail on the merits.⁰

B.  Purposes of and Problems with the Lauritzen Analysis

Determining whether or not American maritime law (statutory or general) applies with respect to a given incident entails a choice of law analysis, mandated by the Supreme Court as a matter

---

waives any claim--however meritorious--that plaintiff is not entitled to recover as a matter of law."); id. at 291.

⁰The two identified purposes are not unrelated, for if American law were held to apply in situations where the United States has no appreciable interest, it would invi. 1962) ("Generally a party must establish a fact which is essential to his claim or defense . . . ."). If American law is not applicable, or if the plaintiff fails to prove one of the specific elements of the cause of action, the suit would, in the o

⁰If the plaintiff has also pled in the alternative the applicability of foreign law (which Neely has not done here), the court may of course adjudicate any such claims over which there is a basis for subject matter jurisdiction. Where the locality and maritime connection tests are met, see supra at 25–28 (discussing admiralty jurisdiction tests), 28 U.S.C. § 1333 will provide such a basis. We note also that some courts have not required a plaintiff affirmatively to plead the applicability of foreign law at the outset, but instead have applied foreign law after concluding that American law does not apply. See, e.g., Schexnider v. McDermott Int'l, Inc., 817 F.2d 1159, 1160–61, 1164 (5th Cir. 1987). Where American law does not apply and the plaintiff and defendant are both foreign, however, admiralty courts sometimes decline to exercise jurisdiction. See 1 BENEDICT ON ADMIRALTY § 128, at 8–40 to –41 & n.9.

30

of statutory construction. The Court adverted to choice of law principles because of the facial universality of the Jones Act, whose terms offer a remedy to "any seaman." 46 U.S.C. § 688(a) (1988). In Lauritzen--which involved a lawsuit by a Danish sailor (for injuries suffered in the coastal waters off Cuba) against his employer, a Danish shipowner with whom he had contracted (in Danish)--the Court was concerned with restricting the "literal catholicity," Lauritzen, 345 U.S. at 576, 73 S. Ct. at 925, of the Jones Act's language to ensure that it would not apply to situations where "the seaman, the employment [and] the injury [lack] the slightest connection with the United States." Id. at 577, 73 S. Ct. at 925. Thus, the first aim of Lauritzen analysis is to assure that American maritime law is not applied to incidents that lack any significant American connection.

The second, related purpose of the analysis is to resolve and avoid conflicts with the maritime laws of other nations.[0] See Lauritzen, 345 U.S. at 582, 73 S. Ct. at 928. To this end the Court invoked a presumption that in the absence of specific direction to the contrary, statutes of Congress would not be interpreted to violate international law. See 345 U.S. at 577, 581, 73 S. Ct. at 926, 927-28. Applying this presumption to the Jones Act, the Court in Lauritzen adopted a form of interest analysis to cabin the sweep of the Jones Act. See id. at 582, 73

---

[0]The two identified purposes are not unrelated, for if American law were held to apply in situations where the United States has no appreciable interest, it would invite other nations to construe their laws in a similar fashion, cf. Lauritzen, 345 U.S. at 582, 73 S. Ct. at 928 (discussing reciprocity concerns), inevitably escalating the number of true conflicts in international maritime contexts to an unacceptably high level.

S. Ct. at 928 ("The criteria, in general, appear to be arrived at from weighing of the significance of one or more connecting factors between the shipping transaction regulated and the national interest served by the assertion of authority.") (emphasis supplied); id. at 577, 73 S. Ct. at 925 (extolling expertise of "courts long accustomed to dealing with admiralty problems in reconciling our own with foreign interests"). Courts ruling on the reach of American law were thus directed to consider seven factors that were, in part for pragmatic reasons, accorded various degrees of importance.

In Romero v. International Terminal Operating Co., 358 U.S. at 354, 79 S. Ct. at 468, the Supreme Court emphasized that the Lauritzen factors were gleaned not from the terms of the Jones Act but rather from more general maritime law choice of law principles, and that they were intended to guide courts generally in applying maritime law regarding personal injury claims to incidents with foreign connections. See 358 U.S. at 382, 79 S. Ct. at 485.[0] Finally, in Hellenic Lines Ltd. v. Rhoditis, the Supreme Court elaborated upon the Lauritzen analysis. In particular, the Court added an eighth factor for consideration, see 398 U.S. at 309, 90 S. Ct. at 1734, and attached a label to the types of contacts with the United States necessary to sustain applicability of American law in light of the aims of the

---

[0]Courts are of course, subject to explicit congressional directives as to choice of law, see Lauritzen, 345 U.S. at 579 n.7, 73 S. Ct. at 926 n.7, where they are constitutional, see Cruz v. Chesapeake Shipping, Inc., 932 F.2d 218, 234 (3d Cir. 1991) (Cowen, J., concurring in the judgment).

32

Lauritzen analysis: "substantial" contacts. Id. at 309 n.4, 90 S. Ct. at 1734 n.4.

In adopting this terminology, the Court placed its focus primarily, though not myopically, on whatever American contacts the transaction may have. See id. ("The decisional process . . . involves the ascertainment of the factors or groups of facts which constitute contacts between the transaction involved in the case and the United States, and then deciding whether or not they are substantial.") (quoting Bartholomew v. Universe Tankships, Inc., 263 F.2d 437, 441 (2d Cir. 1959)); id. at 310, 73 S. Ct. at 1734 ("The [foreign contacts present] are in the totality of the circumstances of this case minor weights in the scales compared with the substantial and continuing contacts that this alien owner has with this country.").

Despite these developments, Lauritzen interest analysis remained a somewhat amorphous process. The Supreme Court stressed in Rhoditis that Lauritzen's choice of law interest analysis is not mechanical, that the significance of each factor is variable, and that the enumerated factors are not exhaustive of potentially relevant considerations. See 398 U.S. at 308, 90 S. Ct. at 1734. The analysis is consequently imbued with a flexibility that permits courts to take account of the context of any incident that American law is alleged to govern, but this malleability has not always proven the surest guide. Indeed, one troubled trial court remarked that the case law applying the Lauritzen triad had "made the relative significances of the 'factors' almost infinitely variable," and it feared "that each

33

'factor's' significance is sufficiently obscure or variable to justify any judicial conclusion." Munusamy v. McClelland Engineers, Inc., 579 F. Supp. 149, 153 (E.D. Tex.), mandamus denied (with request for certification), 742 F.2d 837 (5th Cir. 1984), order vacated, 784 F.2d 1313 (1986). Academic commentary has been similarly critical. See, e.g., Michael Boydston, Cruz v. Chesapeake Shipping and the Choice-of-Law Problem in Admiralty Actions, 27 Tex. Int'l L.J. 419, 434 (1992); Symeon Symeonides, Maritime Conflicts of Law from the Perspective of Modern Choice of Law Methodology, 7 Mar. Law. 223, 242-43 (1982) [hereinafter Symeonides, Maritime Conflicts].

C. The Two Steps of the Laurit_!oice of Law Inquiry

The solution to the lack of guidance lies in approaching the Lauritzen analysis in a way that is faithful to its nature as a specialized form of interest analysis designed to ensure that American maritime law of personal injuries applies only where significant American interests are implicated and only in conformity with international law. Specifically, we interpret the notion of "substantial contacts" to embody these twin concerns in a two-step inquiry derived from international law. We conclude below that, in a Jones Act or general maritime law case, a court deciding whether American contacts are "substantial" (so that American law applies) must at the threshold ask whether one of the following factors is involved in the incident, in which case there is a basis for prescriptive jurisdiction (which, we explain infra subsection 1, means that significant American interests are implicated): injury to an

34

American seaman or a seaman with American dependents, injury in American territory, American defendants, an American flagged ship, or a contractual choice-of-law clause specifying American law.  If so, the second step in the substantial contacts inquiry is for the court to ascertain whether application of American law is reasonable under the circumstances, in which case (as subsection 2 describes) international law is satisfied.[0]

In this case, as we explain below, the plaintiff succeeds on both steps of the inquiry.  Her American citizenship satisfies the threshold requirement of a basis for prescriptive jurisdiction, and consideration of the Lauritzen factors reveals that the American interests at stake here are such that American law may be reasonably applied.  Hence, the American contacts are "substantial" and the plaintiff was entitled to sue under American law.

---

[0] The dissent rejects our analysis, suggesting that "under the Lauritzen test, the plaintiff must prove that a simple majority or preponderance of the factors weighs in favor of United States law."  Dissenting op. infra at 7-8 (emphasis supplied).  While the meaning of this is somewhat unclear (for it seems a hybrid of a counting test and a balancing test), it does not constitute an accurate rendering of the "substantial contacts" formulation adopted in Rhoditis. The "substantial contacts" concept was borrowed from Judge Medina, who explained that "something between minimal and preponderant contacts is necessary if the Jones Act is to be applied." Bartholomew, 263 F.2d at 440 (emphases supplied).  This articulation of the "substantial contacts" standard occurs in the paragraph of Judge Medina's opinion immediately preceding the paragraph that the Supreme Court quoted.  Judge Medina's explanation of "substantial contacts" is thus crucial to understanding the approach adopted by the Court in Rhoditis, and it shows that the American contacts must be more than minimal but need not be preponderant. Hence, the dissent's proposed standard is too stringent.

In the following analysis, we "rely on the Restatement (Third) of Foreign Relations Law for the relevant principles of international law. Its standards appear fairly supported in the decisions of [the Supreme] Court construing international choice-of-law principles ([e.g.,] Lauritzen, Romero, and McCulloch [v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 83 S. Ct. 671 (1963)]) . . . ." Hartford Fire Ins. Co. v. California, 113 S. Ct. 2891, 2920 (Scalia, J., dissenting in part). A primary reason for relying on the Restatement of Foreign Relation Law is that one of the Court's chief motives for cabining the potentially unlimited scope of the Jones Act in Lauritzen was a concern that the legislation not violate norms of international law. While the dissent argues that the sections we rely on "were not meant to apply in a tort case such as this," dissenting op. infra at 4 (quoting RESTATEMENT Pt. IV, Ch. 1, Introd. Note, at 237), the passage it quotes reveals that the Restatement's rules are not unconditionally irrelevant to tort cases: they only "do not necessarily apply." Id. at 5 (different emphasis supplied). However, "[i]n some circumstances, issues of private international law may also implicate issues of public international law, and many matters of private international law have substantial international significance and therefore may be considered foreign relations law[.]" RESTATEMENT § 101, cmt. c, at 23 (emphasis supplied). The Jones Act and American maritime law more generally are examples of just such matters, as is reflected by the Supreme Court's concern in Lauritzen about the prospect of

36

violating <u>international</u> law.[o]  <u>See also</u> <u>infra</u> note 40(discussing

---

[o]While the Restatement of Conflict of Laws is by its terms applicable to cases with foreign elements, <u>see</u> RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 10 (1971) [hereinafter RESTATEMENT OF CONFLICTS], this is only "usually" the case, <u>see</u> <u>id.</u> § 10, cmt. c, and "[t]here are significant differences between interstate and international cases," <u>see</u> <u>id.</u> § 10, cmt. d.

Additionally, to the extent that the Restatement of Foreign Relations Law might seem inapplicable, and the Restatement of Conflicts applicable, we note that these two Restatements in many respects do not fundamentally differ.  The Restatement of Foreign Relations Law explains that "[t]he concepts, doctrines, and considerations that inform private international law also guide the development of some areas of public international law, notably the principles limiting the jurisdiction of states to prescribe, adjudicate and enforce law."  RESTATEMENT § 101, cmt. c, at 23.  The Restatement of Conflicts provides that "[a] court may not apply the local law of its own state to determine a particular issue unless [that] would be reasonable in the light of the relationship of the state and of other states to the person, thing or occurrence involved."  RESTATEMENT OF CONFLICTS § 9, at 31.  This is the same sort of analysis employed in our opinion.  Indeed, the reasonableness factors of § 403 of the Restatement of Foreign Relations Law, <u>see</u> <u>infra</u> note 44 and accompanying text, incorporate the general choice of law factors of § 6 of the Restatement of Conflicts, <u>see</u> RESTATEMENT § 403, reporters' note 10, at 254; the latter are used to determine the state with the most significant relationship to the occurrence and the parties, the law of which state governs (under the Restatement of Conflicts) the rights and liabilities of the parties with respect to tort issues, <u>see</u> RESTATEMENT OF CONFLICTS § 145, at 414.  Additionally, although "[]public international law is dealt with only incidentally" in the Restatement of Conflicts, the rules of the Restatement of Conflicts "do conform . . . to the requirements of public international law."  <u>Id.</u> § 2, cmt. d, at 6.  There is thus important congruence between the Restatement of Foreign Relations Law and the Restatement of Conflicts with respect to the issues before this court.

However, the Restatement of Conflicts rule for personal injury actions specifies that "the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless . . . some other state has a more significant relationship . . . to the occurrence and the parties . . . ."  <u>Id.</u> § 146, at 430.  This rule gives far too much general significance to the place of the wrongful act to constitute a satisfactory interpretation of <u>Lauritzen</u>.  <u>See</u> <u>infra</u> at 57–57 (discussing the variable significance of this factor).  Indeed its very formulation seems alien to <u>Lauritzen</u>-type analysis, which is the touchstone of Part III of our opinion; this suggests

difference between maritime laws and conventional tort law). Furthermore, the views of Lea Brilmayer, one of the leading authorities in the area, support use of the Restatement of Foreign Relations Law here. Professor Brilmayer has analyzed conflict of laws as "the domestic counterpart of the international law issue of the extraterritorial application of American law." Lea Brilmayer, The Extraterritorial Application of American Law: A Methodological and Constitutional Appraisal, 50 L. & Contemp. Probs. 11, 11 (Summer 1987). Of particular relevance here, she has noted the unhelpfulness of the public/private distinction as regards international law: "Whether or not that distinction is viable, it does not describe the different roles of the two Restatements. Some private law cases, such as Lauritzen v. Larsen, fall under the Restatement of Foreign Relations Law." Id. at 12 (footnote observing that Lauritzen is mentioned in the Restatement of Foreign Relations Law § 403, reporters' note 2 omitted; emphasis supplied).[0]

---

the inappropriateness of the Restatement of Conflicts to this case, whatever the declarations of the drafters. Thus, despite the dissent's comments, we are convinced that our reliance on the Restatement of Foreign Relations Law is proper.

[0]Cf. also Mary B. McCord, Responding to the Space Station Agreement: The Extension of U.S. Law into Space, 77 GEO. L.J. 1933, 1945 (1989) (suggesting combining the Lauritzen and Restatement of Foreign Relations Law factors to determine propriety of applying American law to incidents aboard hypothetical multinational space station). Additionally, we believe that relying on current versions of the Restatement to interpret both general maritime law and the Jones Act--even though it was adopted long after the Supreme Court announced the Lauritzen factors--is permissible because the Jones Act was not locked rigidly into place when adopted, see, e.g., McAllister v. Magnolia Petroleum Co., 357 U.S. 221, 225 n.6, 78 S. Ct. 1201, 1204 n.6 (1958) (discussing change in Jones Act statute of limitations upon amendment of FELA after enactment of Jones Act); the Act was relatively recently

38

1.  Do the Contacts Show a Basis for Prescriptive Jurisdiction?

The first essential question in <u>Lauritzen</u> analysis is whether the suit implicates significant interests of the United States. In accordance with <u>Lauritzen</u>'s direction to construe American maritime law so as not to violate international law, we identify this preliminary inquiry with the question whether there is a basis for the United States to exercise prescriptive jurisdiction over the incident at issue.

"International law has long recognized limitations on the authority of states to exercise jurisdiction to prescribe in circumstances affecting the interests of other states." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW Pt. IV, Introd. Note, at 230 (1987) [hereinafter RESTATEMENT]. The Restatement defines prescriptive jurisdiction––which is not to be confused with subject matter jurisdiction––as the authority of a state "to make its law applicable to the activities, relations, or status of persons, or the interests of person in things . . . ." RESTATEMENT § 401(a). It lists several alternative bases for prescriptive

---

amended, <u>see</u> Pub. L. 97–389, Title V, § 503(a), 96 Stat. 1955 (Dec. 29, 1982); when the Court in <u>Rhoditis</u> adopted the concept of "substantial contacts" in 1970, it did not specify how to determine whether a case in fact involves such contacts with the United States; as we have stated, <u>see</u> <u>supra</u> note 37, the Restatement of Foreign Relations Law factors on which we rely below derive from the general choice of law factors of the Restatement (Second) of Conflicts of Law, which was adopted and promulgated by the American Law Institute in 1969; and "United States courts have considered [rules of international law as to prescriptive jurisdiction], and interpreted the known or presumed intent of Congress, <u>in the light of changing understandings</u>," RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW Pt. IV, Ch. 1, at 236–37 (1987) (emphasis supplied).

39

jurisdiction.  As a general matter (subject to restrictions we discuss below), nations may prescribe law

> with respect to
>> (1)  (a)  conduct that, wholly or in substantial part, takes place within its territory;
>>
>>         *     *     *
>>
>>      (c)  conduct outside its territory that has or is intended to have substantial effect within its territory; [and]
>>
>> (2)  the activities, interests, status, or relations of its nationals outside as well as within its territory[.]

RESTATEMENT § 402.  Additionally, the Restatement recognizes the authority of a state to apply its law to activities connected with vessels flying its flag.  See id. § 502.

The Lauritzen factors directly provide the answer to the first question in the Lauritzen choice of law interest analysis--whether (in the terminology of the Restatement) the United States has a basis for prescriptive jurisdiction with respect to the incident.  When an American worker or a worker with American dependents is injured, application of United States law will affect the interests and relations of Americans, and there are likely to be substantial effects within the United States.  Hence, application of American maritime law in suits for personal injuries to American seamen or seamen with American dependents affects the interests of nationals of the United States, thus providing a basis for prescriptive jurisdiction pursuant to Restatement § 402(2) and § 402(1)(c).[0]  Next, by

_____

[0]Since Neely is undisputedly an American domiciliary and citizen, we do not need to decide here what is necessary for a seaman to be treated as an American for purposes of Lauritzen

40

definition, injuries occurring in American territory (including waters) fall within § 402(1)(a), which thus recognizes that the United States has a basis for prescriptive jurisdiction over such incidents. Where the defendants are American, a basis for prescriptive jurisdiction to apply United States law exists

_____

analysis. <u>Cf.</u> Brian Jay Corrigan, <u>The Status of the Quasi–American Bluewater Seaman in the American Courts</u>, 10 MAR. LAW. 269 (1987). <u>But cf.</u> 46 U.S.C. § 688(b)(2) (1988) (placing conditions on availability of Jones Act to brownwater seamen not citizens or permanent resident aliens of the United States). Additionally, we acknowledge that the "passive personality principle," which "asserts that a state may apply law––particularly criminal law––to an act committed outside its territory by a person not its national where the victim of the act was its national[,] . . . . has not been generally accepted for ordinary torts or crimes . . . ." RESTATEMENT § 402 cmt. g. However, the Jones Act and the general maritime law unseaworthiness cause of action are primarily "concerned with prescribing particular remedies, rather than . . . regulating commerce or creating a standard for conduct." <u>Rhoditis</u>, 398 U.S. at 313, 90 S. Ct. at 1736 (Harlan, J., dissenting). Moreover, these causes of action are civil, not criminal, and thus represent a lesser potential intrusion on the prescriptive jurisdiction of other sovereigns. <u>See</u> RESTATEMENT § 403 Reporter's Note 8 ("In applying the principle of reasonableness, the exercise of criminal (as distinguished from civil) jurisdiction in relation to acts committed in another state may be perceived as particularly intrusive. . . . It is generally accepted by enforcement agencies of the United States government that criminal jurisdiction over activity with substantial foreign elements should be exercised more sparingly than civil jurisdiction over the same activity, and only with strong justification."). Finally, where seamen are injured in the course of their employment, torts are not "ordinary," for seamen have long been considered wards of admiralty entitled to special protection different from that afforded by conventional tort law. <u>See, e.g.,</u> <u>Seas Shipping Co. v. Sieracki</u>, 328 U.S. 85, 104, 66 S. Ct. 872, 882 (1946) (Stone, C.J., dissenting) ("[T]he seaman has been given a special status in the maritime law as the ward of the admiralty, entitled to special protection of the law not extended to land employees."); <u>Socony–Vacuum Oil Co. v. Smith</u>, 305 U.S. 424, 430–31, 59 S. Ct. 262, 266 (1939) (citing cases); <u>id.</u> at 431, 59 S. Ct. at 266 ("[S]eamen are the wards of the admiralty, whose traditional policy it has been to avoid, within reasonable limits, the application of rules of the common law which would affect them harshly because of the special circumstances attending their calling.").

41

pursuant to § 402(2).  Where the ship involved flies the American flag, § 502 of the Restatement recognizes prescriptive jurisdiction on the part of the United States.

Finally, parties may generally consent to application of American law to govern their relations, as evidenced by a choice of law clause.  Cf. National Ass'n of Sporting Goods Wholesalers, Inc. v. F.T.L. Mktg. Corp., 779 F.2d 1281, 1285 (7th Cir. 1985) (citing Casio, Inc. v. S.M. & R., Co., 755 F.2d 528, 531 (7th Cir. 1985)).  In such cases it may be technically imprecise to speak of prescriptive jurisdiction, for American law applies not by virtue of the sovereign power of the United States but rather by the choice of the parties.  However it is styled, a reasonable, mutual, ex ante choice of American law would create an American interest in applying the Jones Act or American general maritime law sufficient to meet the threshold requirement.[0]

In sum, then, we hold that a plaintiff generally must establish one of the following to demonstrate a basis for prescriptive jurisdiction, which under the Lauritzen analysis is a threshold requirement for American maritime law to apply:

---

[0]In contrast, however, the mere making of a contract in the United States, without a provision agreeing to American law and without other American contacts, would generally be insufficient by itself to meet the threshold requirement of a significant American interest in applying American law.  Since international commercial shippers customarily have taken on help where they have needed it, see Lauritzen, 345 U.S. at 588, 73 S. Ct. at 931, the happenstance of a contract's being made in an American port cannot reasonably be presumed to reflect consent to application of American law to any injuries to the bluewater seaman, nor would it (without more) ground prescriptive jurisdiction over an injury abroad pursuant to § 402(1)(a), for it would not in our view constitute a "substantial part" of the relevant conduct.

(a)  injury to an American seaman or a seaman with American
     dependents,
(b)  injury in American territory,
(c)  American defendants,
(d)  an American flagged ship, or
(e)  a contractual choice-of-law clause specifying American
     law.

See also Bailey v. Dolphin Int'l, Inc., 697 F.2d 1268, 1278 n.25 (5th Cir. 1983) ("[A] sufficient American interest in a particular transaction can rest on the presence of even one substantial contact between the transaction and this country . . . ."), overruled on other grounds by In re Air Crash Disaster Near New Orleans, 821 F.2d 1147 (5th Cir. 1987) (en banc).

The plaintiff's threshold burden of proving one of these contacts with the United States arises when a defendant alleges that American law is inapplicable under the Lauritzen triad. The plaintiff must proffer evidence from which a jury might conclude that one of the specified factors supporting prescriptive jurisdiction exists, and if the evidence introduced by either side (as to the existence vel non of one of the pertinent United States contacts) as a whole does not establish by a preponderance that such a factor exists, the court must hold American law inapplicable.

In the present case, the Lauritzen factors clearly exhibit a basis for prescriptive jurisdiction. It is uncontested that Neely, the injured seaman, is an American citizen. This American contact is among those we have identified as implicating significant American interests, and we turn therefore to the second step of the inquiry.

43

<u>2.    Are the Contacts Such That Application of American Law Would</u>

<u>Be Reasonable?</u>

Where plaintiffs have shown that there is a basis for prescriptive jurisdiction, significant American interests are implicated, and courts must consider the second goal of the <u>Lauritzen</u> analysis in determining whether American law is applicable.    The second step in the <u>Lauritzen</u> choice of law inquiry is concerned with resolving or avoiding conflicts with foreign law by construing American law in harmony with international law.    We identify the pertinent inquiry primarily with the restriction on prescriptive jurisdiction described by § 403(1) of the Restatement.    Section 403(1) expresses a limitation on the <u>exercise</u> of prescriptive jurisdiction. It specifies that "[e]ven when one of the bases for jurisdiction under § 402 is present, a state may not exercise jurisdiction to prescribe law with respect to a person or activity having connections with another state when the exercise of such jurisdiction is unreasonable," RESTATEMENT § 403(1); in determining whether it is reasonable to apply American law, courts are to consider "all relevant factors," <u>id.</u> § 403(2), which includes the American contact that provided a basis for prescriptive jurisdiction.[0]

---

[0]For determining whether application of American law is reasonable, the Restatement directs courts to evaluate

all relevant factors, including where appropriate:

(a)    the link of the activity to the territory of the regulating state, <u>i.e.,</u> the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;

Thus, the plaintiff's burden of proving the applicability of American law translates at this step to a burden of proving reasonableness. This burden does not require the plaintiff to show the absence of foreign contacts, or to bear a burden of proof with respect to each of the Lauritzen factors, as the

> (b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;
> (c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;
> (d) the existence of justified expectations that might be protected or hurt by the regulation;
> (e) the importance of the regulation to the international political, legal, or economic system;
> (f) the extent to which the regulation is consistent with the traditions of the international system;
> (g) the extent to which another state may have an interest in regulating the activity; and
> (h) the likelihood of conflict with regulation by another state.
>
> RESTATEMENT § 403(2); see also Republic of Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 76 n.1 (3d Cir. 1994) (noting usefulness of these factors).
>
> Romero and Rhoditis provide benchmarks by which to gauge this reasonableness. In both of these cases there was a basis for prescriptive jurisdiction, for the injuries occurred in American waters. In Romero, where the injured seaman was Spanish, the ship was of Spanish registry and sailed under the Spanish flag, the shipowner was a Spanish corporation, and the seaman's employment contract was entered into in Spain, the Supreme Court held that the contacts with the United States (the place of the seaman's injury and treatment and the largely immaterial law of the forum) were not sufficient to justify application of American law, 358 U.S. at 383-84, 79 S. Ct. at 486; we take this to mean that the application of American law would not have been reasonable in those circumstances. In Rhoditis, in contrast, the Court determined that the American contacts--the place of the wrongful act, law of the forum, and defendant's base of operations--were in combination substantial, 398 U.S. at 310, 90 S. Ct. at 1734; application of American law was reasonable.

45

defendants urge, see Reply Br. of Appellees/Cross-Appellants, at 3. While there is a dearth of precedent concerning the scope of the plaintiff's burdens when the defendant invokes the Lauritzen triad, logic dictates that the plaintiff need adduce evidence concerning only those factors that he or she believes support the reasonableness of applying American law. The individual factors are not required elements of a Jones Act or general maritime law claim--the Supreme Court has made clear that no particular factor need reflect a contact with the United States for a plaintiff to have a claim under American law, see, e.g., Rhoditis, 398 U.S. 306, 90 S. Ct. 1731 (applying American law despite foreign employer, foreign-flag ship, foreign plaintiff, and contract in foreign language specifying foreign law)--but rather are subsidiary indicia of the reasonableness of applying American law. Moreover, general choice of law analyses do not deem a plaintiff responsible for bringing forth information on all circumstances--whether helpful or harmful to the plaintiff's case--that might inform the choice of law. For all these reasons, we decline to impose such a requirement here.[0]

---

[0] The dissent misapprehends the nature of our analysis, believing that our opinion requires "defendants to show that United States law does not apply." Dissenting op. infra at 6. This inference is unsupported by the quoted passage, which only requires defendants to prove the existence of foreign contacts to avoid an adverse judgment once plaintiffs have proven that there are significant American interests implicated, and which does not relieve plaintiff of the ultimate burden of showing the applicability of American law. Similarly, the dissent's bald assertion that under our analysis, defendants who show that "more of the factors weigh in favor of the application of foreign law" still must "show that the application of United States law is unreasonable," dissenting op. infra at 8, divorces the statement on which it relies ("[U]nless virtually all of the Lauritzen factors point away from the United States, application

46

Instead, once the plaintiff has established the existence of

a basis for prescriptive jurisdiction, it is incumbent upon

of American law will be reasonable . . . .") from the actual framework of the analysis. Unlike the dissent, our opinion clearly states that the quoted proposition is limited to cases where there appear <u>no</u> foreign contacts. In such a case, where significant American interests are implicated and no foreign interests (so far as the court can tell) are threatened, the plaintiff has met his or her burden of showing that application of American law is reasonable because only American interests have been shown to be at risk.

Moreover, the dissent apparently believes that a plaintiff's burden of proving that the American contacts are "substantial" implies that individual <u>Lauritzen</u> factors count <u>against</u> the plaintiff until she or he proves otherwise. <u>See, e.g.,</u> dissenting op. <u>infra</u> at 21 ("Because plaintiff bears the burden of proof, this factor [inaccessibility of a foreign forum, which the majority opinion treats as neutral] weighs against applying United States law to this dispute."). For this reason the dissent's approach and ours are fundamentally at odds. In metaphorical terms, the majority opinion starts with a normal scale, one in balance, and requires the plaintiffs to bring it down onto the American side; we compare whatever weights the defendants put in the scale against whatever weights the plaintiffs put in the scale; and if the scale remains down on the foreign side <u>or if it remains in balance</u> at the end of all this, the plaintiffs have not made out their burden of proof as to the substantiality of American contacts and thus have not prevailed. The dissent, in contrast, apparently would start with a skewed scale, one pre-positioned down on the foreign side, and require plaintiffs first to bring the scales back to equipoise and then further to move the American pan beyond that point. This goes beyond placing the burden of proof on the plaintiffs by building in a presumption (albeit in theory rebuttable) that in each case the <u>Lauritzen</u> factors come stacked against application of American law. That approach is itself unsupported by case law.

In rejecting the dissent's position, we do not suggest that the significance of foreign contacts is irrelevant to the question whether American contacts are "substantial" enough for American law to apply; nevertheless, courts should not uniformly presume from the outset that every Jones Act or general maritime law suit implicates important foreign interests that will be compromised by application of American law. If the defendant in a case does not urge that American law is inapplicable under the <u>Lauritzen</u> triad, the court need not even engage in the analysis, regardless of what foreign interests <u>could</u> be implicated. If the defendant does not put on evidence that foreign interests <u>are</u> indeed implicated, courts should not presume otherwise.

47

defendants to prove the existence of foreign contacts'. This allocation of burdens comports with the remedial policies behind the Jones Act (and the unseaworthiness cause of action), which is designed for the protection of seamen. Information relevant to a great variety of the circumstances that could figure in a Lauritzen analysis may be in the hands of defendants. We therefore believe that it would be at odds with Congress's solicitous intent for courts to require seamen to make a negative showing with respect to factors on which they do not rely in establishing the reasonableness of applying American law.[0]

If the court concludes that the evidence as a whole does not establish the existence of any foreign contacts that would provide a foreign nation with a basis for prescriptive jurisdiction, the plaintiff immediately prevails on the choice of law issue: a preponderance of--indeed, all--the evidence shows that the application of American law in such a case is reasonable. As long as the plaintiff has shown a basis for prescriptive jurisdiction, cf. DeMateos v. Texaco, Inc., 562 F.2d 895, 900 (3d Cir. 1977) ("[D]ue process require[s] the identification of significant American interests before an American sovereignty . . . [may] export its laws to foreign transactions . . . ."), American interests are implicated, and maritime law may apply unless concerns about conflicts with the law of other interested nations compel the conclusion that this would not be reasonable. Where there are no significant foreign

---

[0]Cf. infra note **Error! Bookmark not defined.** and accompanying text.

48

contacts, the court cannot conclude that any other nation is interested in the relevant sense. And since the plaintiff has by this step of the inquiry established an American contact that implicates significant American interests, this in turn establishes that application of American law is reasonable and proper.

Foreign contacts standing alone, however, are of extremely limited value, for "the actual conflict before the court is a conflict between competing laws, not between physical contacts. Such conflicts can be resolved intelligently and rationally only by ascertaining and evaluating the policies underlying the competing laws." Symeonides, Maritime Conflicts, 7 MAR. LAW. at 245; see also Romero, 358 U.S. at 383, 79 S. Ct. at 486 ("The controlling considerations are the interacting interests of the United States and of foreign countries . . . .") (emphasis supplied). Indeed, Lauritzen analysis generally seems to presuppose that the court has information concerning the substantive content of foreign law. See, e.g., Lauritzen, 345 U.S. at 575–76, 73 S. Ct. at 924–25 (developing at outset the conflict between American and Danish law); id. at 582, 73 S. Ct. at 928 ("The criteria, in general, appear to be arrived at from weighing of the significance of one or more connecting factors between the shipping transaction regulated and the national interest served by the assertion of authority.") (emphasis supplied).

Consequently, where the substance of foreign law is unknown, the Lauritzen inquiry could at most be used prophylactically, to

49

steer clear of potential but unknown conflicts. Because holding American law inapplicable at this point would do so without a textual mandate--and with significant American interests present--such judicially imposed restraint should not be de rigueur.  A court typically should not hold that the United States' exercise of prescriptive jurisdiction is unreasonable in a case where the substance of relevant foreign law is unknown, unless it concludes that the basis for prescriptive jurisdiction is exceedingly weak and that virtually all other contacts likely implicate policies of the foreign nation.

Moreover, the plaintiff generally has no responsibility to demonstrate the content of potentially applicable foreign law.[0] At this step of the inquiry, a defendant's continued insistence that the established American contacts are not "substantial" amounts to the argument that American law should be interpreted not to apply in order to accommodate the policies served by some foreign law.[0]  In effect, then, the defendant seeks to rely on foreign law to set up an obstacle to American law.  For the same or similar reasons that plaintiffs need not establish <u>Lauritzen</u>

---

[0] <u>But see</u> <u>infra</u> note **Error! Bookmark not defined.** and accompanying text (discussing burden on foreign plaintiffs in Jones Act cases).

[0] In construing the Jones Act in <u>Lauritzen</u>, the Supreme Court observed that the Act was

> enacted with regard to a seasoned body of maritime law developed by the experience of American courts long accustomed to dealing with admiralty problems in reconciling our own with foreign interests and in <u>accommodating the reach of our own laws to those of other maritime nations</u>.

345 U.S. at 577, 73 S. Ct. at 925 (emphasis supplied).

factors that do not support their case,[0] the responsibility for demonstrating the content of foreign law rests with the defendants who wish to use it to defeat a claim under American law.[0] To hold otherwise would be at odds with congressional intent, for where Congress does want to impose upon a seaman the onus of establishing the content of foreign law in order to proceed under American law, it knows how to draft an appropriate provision: In the 1982 amendments to the Jones Act, Congress denied the benefit of the Act to foreign seamen in certain circumstances unless they show that foreign law offers them no remedy. <u>See</u> 46 U.S.C.A. § 688(b)(2).[0]

---

[0] <u>See also</u> <u>Lauritzen</u>, 345 U.S. at 584, 73 S. Ct. at 929 (referring to the many "varieties of legal authority" through whose territorial jurisdiction a seaman might pass).

[0] This holding also accords with Federal Rule of Civil Procedure 44.1, which provides that "[a] party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable notice." <u>Cf.</u> 9 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2443, at 642 (2d ed. 1994) ("Notice normally will be given by the party whose claim <u>or defense</u> is based on foreign law. It would be contrary to the purpose of the rule, however, to allow the other party to remain silent if no notice has been given and claim at the last moment that the opposing party, who has relied irretrievably on domestic law, is required to look to foreign law.") (emphasis supplied).

[0] <u>See also</u> Symeonides, <u>Maritime Conflicts</u>, 7 MAR. LAW. at 225–26 ("[C]ongressional delineation of the transnational reach of American maritime legislation should be very useful in resolving conflicts problems in those areas of admiralty law where Congress has not spoken or has spoken with insufficient clarity, such as in the area of the general maritime law or the Jones Act."). As Symeonides notes, the explicit reach of those Congressional statutes affecting seamen that do address the choice of law issue may suggest that the Jones Act and general maritime law unseaworthiness causes of action should be given broad sweep:

In all of the above cases where Congress has specifically addressed the choice-of-law problem, it has delineated the reach of American legislative jurisdiction in such an expansive way as to include many essentially foreign cases

In this case, the evidence presented at trial establishes the existence of foreign contacts, but the defendants have presented no information concerning what potentially applicable St. Lucian law might provide. Indeed, even at in banc reargument before this court they were unable to state what the law of St. Lucia provided (and they have made no post-argument submissions). Accordingly, we cannot calibrate the extent of foreign interests at stake, and unless virtually all of the Lauritzen factors point away from the United States, application of American law will be reasonable in light of the American interests that the plaintiff has shown to be implicated. With this in mind, we now consider the various factors.

a.   Inaccessibility of a Foreign Forum

We regard the potential inaccessibility of a foreign forum as a relatively insignificant factor in favor of the law of any

---

which would normally fall outside the reach of American law. Thus, although all other factors may be foreign, the temporary physical presence of the seaman in American waters at the time of the filing of the suit suffices for the application of the Seamen's Act. Similarly, the beginning or the termination of the voyage at an American port, without any other American connection, suffices for the application of the Limitation of Liability Act and COGSA. American law is thus made applicable on the showing of only a minimum connection with the American legal order. . . . [T]his overreach of American legislative jurisdiction is less than commendable from an internationalist view point; nevertheless, it is the only congressional directive we have to delineate the transnational reach of American maritime law in general. Nationalistic or not, the spirit of this legislation should provide a guideline in resolving choice-of-law problems in those areas where Congress has not spoken, or has spoken with insufficient clarity as in the area of general maritime law, the Jones Act and the Death on the High Seas Act (DOHSA).

Id. at 234-35 (footnotes omitted).

jurisdiction, American or St. Lucian. As the Supreme Court explained in Lauritzen, inaccessibility of a foreign forum is a consideration more appropriate to a forum non conveniens-type analysis than to the question of the extraterritorial reach of a statute. See Lauritzen, 345 U.S. at 589-90, 73 S. Ct. at 932. Accordingly, we do not think that the degree to which a forum in St. Lucia might be inaccessible to Neely particularly supports application of American law in this case. Nor, however, does it count against the reasonableness of applying American law, and especially so because the defendants have presented the court with no information about what remedies St. Lucian law might or might not offer the plaintiff.

b.    Law of the Forum

We do know what American law provides, but the law of the forum (the seventh factor) was considered by the Supreme Court in Lauritzen to be a very weak consideration in favor of application of American law:

> The purpose of a conflicts-of-laws doctrine is to assure that a case will be treated in the same way under the appropriate law regardless of the fortuitous circumstances which often determine the forum. Jurisdiction of maritime cases in all countries is so wide and the nature of its subject matter so far-flung that there would be no justification for altering the law of a controversy just because local jurisdiction of the parties is available.

Lauritzen, 345 U.S. at 591, 73 S. Ct. at 932. Despite this disparagement of the law of the forum, the Court treated it as a relevant factor in Rhoditis. See Rhoditis, 398 U.S. at 308, 90

53

S. Ct. at 1733.  Thus, albeit weakly, the law of the forum supports application of American law.[0]

c.  Place of the Wrongful Act

In conducting the Lauritzen reasonableness inquiry, courts must attend to the context of the incident at the heart of the suit.  Where seamen are not plying the world's seas in traditional international shipping activity, some contacts take on heightened significance and others diminished significance, for some of the rationales concerning the significance of the factors articulated in the Lauritzen opinion do not apply with the same force in all circumstances.  See, e.g., Zipfel v. Halliburton Co., 832 F.2d 1477, 1482–83 (9th Cir. 1987); Chiazor v. Transworld Drilling Co., 648 F.2d 1015, 1019 (5th Cir. 1981), overruled on other grounds by In re Air Crash Disaster Near New Orleans, 821 F.2d 1147 (5th Cir. 1987) (en banc).  Although some of the cases recognizing the variability of the Lauritzen factors' significance refer to the type of vessel at issue, see, e.g., Zipfel, 832 F.2d at 1482 ("cases involving atypical vessels"), the basis for the distinctions is not the nature of the vessel but rather, as our discussion below illustrates, the nature of the activity, see, e.g., Fogleman v. ARAMCO, 920 F.2d 278, 282 (5th Cir. 1991) ("[T]he significance of each factor in a

_____

[0]While the dissent correctly characterizes the passage we quote from Lauritzen as signifying that the law of the forum factor "should not dictate the substantive law to be applied," dissenting op. infra at 27 (emphasis supplied), it is incorrect in suggesting that the law of the forum is irrelevant:  there is a difference between being irrelevant and being non-dispositive.  Hence our conclusion is that the law of the forum factor favors the plaintiff here only "weakly."

54

nontraditional maritime <u>context</u> like offshore oil production may vary from that in the traditional <u>shipping</u> context in which the <u>Lauritzen</u>–<u>Rhoditis</u> test arose.") (emphases supplied); <u>Phillips v. Amoco Trinidad Oil Co.</u>, 632 F.2d 82, 86 (9th Cir. 1980) (distinguishing the case before the court from "a typical maritime case involving a vessel <u>sailing in international commerce</u>") (emphasis supplied). Common sense confirms that this is a non-traditional Jones Act case. The activity here took the <u>Long John</u> and its crew not from sea to sea in pursuit of international commerce but rather from beach to reef in aid of scuba diving adventures. This case is thus the antithesis of a traditional international shipping case, and we treat it accordingly.[o]

---

[o]The dissent believes that the majority opinion "adopts inconsistent positions when discussing the traditional or nontraditional character of the activity in which the <u>Long John</u> was engaged . . . ." Dissenting op. <u>infra</u> at 15. However, there is no inconsistency. Our jurisdictional conclusion in Part II <u>supra</u> was that the activity of the <u>Long John</u> was "substantial[ly] relat[ed] to traditional maritime activity." <u>Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.</u>, 115 S. Ct. 1043, 1051 (1995) (quoted without alteration or emphasis <u>supra</u> at 25). The Supreme Court itself has distinguished between vessels actually "<u>engaged</u> in commercial maritime activity", <u>Foremost Ins. Co. v. Richardson</u>, 457 U.S. 668, 674, 102 S. Ct. 2654, 2658 (1982), and ones whose activity "bears a substantial relationship to traditional maritime activity," <u>id.</u> at 675 n.5, 102 S. Ct. at 2658 n.5. Only the latter is necessary for admiralty jurisdiction, but more than that is presupposed at some points in the reasoning of <u>Lauritzen</u>.

In this case, the <u>Long John</u>'s expeditions, involving navigation of a vessel in navigable waters, bore a substantial relationship to traditional maritime activity, but the vessel was not engaged in commercial maritime activity. Here, the salient fact, that to which we refer by the designation "non-traditional activity," is that the <u>Long John</u> did not travel the world's seas engaged in commercial shipping. As our opinion explains, it is this substantive factor of traveling or lack thereof -- and not any purported formal similarity of the <u>Long John</u> to various oil-

55

In traditional international shipping contexts, the place of the wrongful act is accorded little importance in the choice of law inquiry. International shipping vessels journey through the waters of many different nations, and the local law might therefore change frequently, see Lauritzen, 345 U.S. at 585, 73 S. Ct. at 930, rendering difficult the protection or even the formation of justified expectations about the law governing seamen's employment relations if the place of the injury were a significant factor. Cf. Romero, 358 U.S. at 384, 79 S. Ct. at 486 ("an unduly speculative burden"). Moreover, the site of the injury will largely be fortuitous when the seaman is exposed to the same risks throughout the course of the journey and an accident happens to occur in a particular locale. See, e.g., id.; Fogleman, 920 F.2d at 282 ("The place of the wrongful act is accorded little weight in traditional maritime cases, in which the locality of the ship changes constantly.").

In non-traditional contexts, however, the vessels at issue do not ply the waters of multiple seas. It may be predicted at the outset that any injuries will likely occur, non-fortuitously, in the locale where the vessel is stationed. Thus, the justified expectations would not be thwarted if the place of the act were considered a significant choice of law factor. See, e.g., Fogleman, 920 F.2d at 282 ("When the injury stems from work on a

---

drilling rigs or supposed resemblance of the Long John's scuba diving missions to oil-drilling operations –– that bears upon some of the rationales in Lauritzen and thus upon the significance of some of the Lauritzen factors.

permanently situated offshore oil rig or work platform, however, the place of the wrong assumes greater importance.").

This "shift" is relevant in this case, which did not arise in a traditional international shipping context. Admittedly, the Long John, the ship that injured plaintiff, was a sixteen metric ton vessel capable of plying the high seas, unlike the drilling platforms that have been involved in many non-traditional cases. But as we have already explained, it is the nature of the activity, not of the vessel, that matters. The Long John was used at the time of plaintiff's accident solely for Club Med scuba diving expeditions in the waters off St. Lucia. Similarly, plaintiff, an American citizen, contracted in the United States to serve as a scuba instructor, specifically to take Club Med guests on scuba diving expeditions off the coast of St. Lucia. She was a crewmember of a fleet (which included the Long John) used solely for this purpose. Thus, the location of this accident was not "fortuitous" in the same way as that of a shipboard tort against a traditional seaman. Due to the non-traditional context of this suit, the place of the wrongful act would normally take on greater significance.

All parties now agree that the injury occurred in St. Lucian waters, and there is no suggestion that the allegedly improper training complained of by the plaintiff in her Jones Act count occurred in the United States. The location of this accident presumably implicates, with more force than it might in cases involving traditional sea-going vessels, whatever regulatory interests St. Lucia may have in applying its law to this

57

accident.  But because St. Lucia's interests are undefined in this case, this factor does not strongly suggest that application of American law would not be reasonable.[o]

### d.  Place of Contract

Another factor whose significance shifts in non-traditional contexts is the place of contract.  In <u>Lauritzen</u>, the Supreme Court discounted the importance of the place of contract for choice of law.  It reasoned that "[a] seaman takes his employment, like his fun, where he finds it; a ship takes on crew in any port where it needs them."  345 U.S. at 588, 73 S. Ct. at 931.  However, although the place of contracting is "of little import due to its 'fortuitous' occurrence for the traditional seaman, [it] becomes a substantial factor in nontraditional maritime employment aboard a vessel more or less permanently located off the coast of a particular country."  <u>Fogleman</u>, 920 F.2d at 283 (footnotes omitted).  <u>See also</u> <u>Chiazor</u>, 648 F.2d at 1019.

The relatively stationary nature of the employment setting allows the ex ante formation of reasonable beliefs about the locale of likely work-related injuries, and there are therefore

---

[o]The dissent asserts that this conclusion contradicts our earlier conclusion that the accident here is the sort with a potential for disrupting maritime commerce. <u>See</u> dissenting op. <u>infra</u> at 23.  There is no contradiction.  We do not doubt the possibility that St. Lucia could have interests in investigating incidents such as this one or in preventing unseaworthy conditions such as those involved here.  However, without knowing the content of St. Lucian law, we have no basis for concluding that application of American law threatens whatever St. Lucia's interests may be, and thus the place of the wrongful act in this case presents little reason to "accommodate the reach" of American maritime laws to those of St. Lucia.  <u>See</u> <u>supra</u> note 50and accompanying text.

fewer unforeseen contingencies to detract from the importance of the site of contracting. The Court downplayed this factor in Lauritzen largely because of the fortuity of the place of contracting, when international shippers took on crew as needed in various nations' ports. However, with a non-traditional operation such as the one here, employers need not (and do not) take on crewmembers at random ports as hiring needs dictate; rather, they may (and do) select employees in advance, wherever they choose.

In this case, the place of contracting was the United States. After interviewing in the United States, plaintiff received a letter of interest from the defendants before their need for another scuba instructor at Holiday Village even arose. Several months later she formed an oral contract to work for Club Med Management and Holiday Village in St. Lucia for six weeks, with offer and acceptance occurring during a telephone call between New York and either Washington, D.C. or Pennsylvania. Thus, since the parties contracted in America for employment in a determinate, fix_!